# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

DEC 3 0 2002

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| ***CARLOS TREVINO, ET. AL. ,*** | § | |
| Plaintiffs, | § | |
| | § | |
| **v.** | § | Civil Action No. B: 02-165 |
| | § | |
| ***STATE OF TEXAS (Department of*** | § | |
| ***Public Safety)*** | § | |
| ***and OFFICER RAUL GARZA*** | § | |
| Defendants. | § | |
| | § | |

# Rule 26(a)(1) Disclosures

COMES NOW, Carlos Trevino, Sylvia Pinales, Alejandro Trevino, Claudia Pinales and Elsa Guerrero Herein after referred to as the Plaintiff/Petitioners and , make their initial disclosures pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure as follows:

**26(a)(1)(A)**     The names, addresses, telephone numbers, and description of the subject for which persons have knowledge of relevant facts:

1.)   Carlos Trevino
2425 Bernard Rd. , # 37 A
Brownsville, Texas 78520
(956)  504-0746
Plaintiff/Petitioner who was harmed as a result of the actions of the State of Texas.

2.)   Silvia Pinales Trevino
2425 Bernard Rd. , # 37 A
Brownsville, Texas 78520
(956) 504-0746
Plaintiff/Petitioner who was harmed as a result of the actions of the State of Texas.

3.)    Claudia Pinales
       2425 Bernard Rd. , # 37 A
       Brownsville, Texas 78520
       Plaintiff/Petitioner who was harmed as a result of the actions of the State
       of Texas.

4.)    Alejandro Trevino
       2425 Bernard Rd. , # 29 A
       Brownsville, Texas 78520
       No phone at this time, however he can be reached through counsel.
       Plaintiff/Petitioner who was harmed as a result of the actions of the State
       of Texas.

5.)    Elsa Guerrero
       2425 Bernard Rd. , # 29 A
       Brownsville, Texas 78520
       No phone at this time, however he can be reached through counsel.
       Plaintiff/Petitioner who was harmed as a result of the actions of the State
       of Texas.

6.)    Major Artemio Garza
       T.D.P.S
       5805 N. Lamar Blvd.- Box 4087
       Austin, Texas 78773
       (512) 424-2000
       Supervisor at the Texas Department of Public Safety believed to have
       knowledge of the events and conditions leading up to the injuries suffered
       by the Plaintiff/Petitioners

7.)    Captain Hector Ramos
       T.D.P.S.
       5805 N. Lamar Blvd.- Box 4087
       Austin, Texas 78773
       (512) 424-2000
       Supervisor at the Texas Department of Public Safety believed to have
       knowledge of the events and conditions leading up to the injuries suffered
       by the Plaintiff/Petitioners

8.)   Lieutenant Mario Lopez
      T.D.P.S.5805 N. Lamar Blvd.- Box 4087
      Austin, Texas 78773
      (512) 424-2000
      Supervisor at the Texas Department of Public Safety believed to have
      knowledge of the events and conditions leading up to the injuries suffered
      by the Plaintiff/Petitioners.

9.)   Sergeant Felipe Escobedo
      T.D.P.S.
      5805 N. Lamar Blvd.- Box 4087
      Austin, Texas 78773
      (512) 424-2000
      Supervisor at the Texas Department of Public Safety believed to have
      knowledge of the events and conditions leading up to the injuries suffered
      by the Plaintiff/Petitioners.

10.)  Captain David Outon
      T.D.P.S.
      5805 N. Lamar Blvd.- Box 4087
      Austin, Texas 78773
      (512) 424-2000
      Supervisor at the Texas Department of Public Safety believed to have
      knowledge of the events and conditions leading up to the injuries suffered
      by the Plaintiff/Petitioners.

11.)  Trooper Raul Garza
      T.D.P.S.
      5805 N. Lamar Blvd.- Box 4087
       Austin, Texas 78773
      (512) 424-2000
      Trooper who is specifically blamed for causing severe injury to Carlos
      Trevino.

12.)  Charles Graham
      T.D.P.S.
      5805 N. Lamar Blvd.- Box 4087
      Austin, Texas 78773
      (512) 424-2000
      Supervisor at the Texas Department of Public Safety believed to have
      knowledge of the events and conditions leading up to the injuries suffered
      by the Plaintiff/Petitioners.

13.) Custodian of Medical Records
First Rio Valley Medical P.A.
620 Paredes Line Rd.
Brownsville, Texas  78521
(956) 548-2225
Treated Plaintiff/Petitioners injuries after the incident giving rise to this litigation.

14.) Treating Doctor
First Rio Valley Medical P.A.
620 Paredes Line Rd.
Brownsville, Texas  78521
(956) 548-2225
Treated Plaintiff/Petitioners injuries after the incident giving rise to this litigation.

15.) Custodian of Medical Records
Valley Regional Medical Center
100-A  Alton Gloor Blvd.
Brownsville, Texas 78526
(956) 350-7000
Treated Plaintiff/Petitioners injuries after the incident giving rise to this litigation.

16.) Treating Physician
Valley Regional Medical Center
100-A  Alton Gloor Blvd.
Brownsville, Texas 78526
(956) 350-7000
Treated Plaintiff/Petitioners injuries after the incident giving rise to this litigation.

17.) Dr. A. Betancourt
2866 Sweet St.
Brownsville, Texas 78520
(956) 504-1322
Treated Plaintiff/Petitioners injuries after the incident giving rise to this litigation.

18.)    Custodian of Medical Records
        2866 Sweet St.
        Brownsville, Texas 78520
        (956) 504-1322
        Treated Plaintiff/Petitioners injuries after the incident giving rise to this
        litigation.


**26(a)(1)(B)**        A copy of, or a description by category and location of, all
                       documents, data compilations, and tangible things that are in the
                       possession, custody, or control of the party and that the disclosing
                       party may use to support its claims.

1.)    Letter from Charles Graham to Carlos Trevino
       Dated December 4, 2001    **(Exhibit No. 1)**

2.)    A.    Personal Complaint Affidavit of Carlos Trevino
             Dated August 28, 2001       **(Exhibit No. 2A)**

       B.    Affidavit of Acknowledgment of Elsa Guerrero
             Dated August 28, 2001       **(Exhibit No. 2B)**

       C.    Affidavit of Acknowledgment of Sylvia Trevino
             Dated August 28, 2001          **(Exhibit No. 2C)**

             D.    Affidavit of Acknowledgment of Claudia Pinales
             Dated August 28, 2001       **(Exhibit No. 2D)**

       E.    Affidavit of Acknowledgment of Alejandro Guerrero
             Dated August 28, 2001       **(Exhibit No. 2E)**

3.)    A.    Transcribed Statement of Elsa Guerrero
             Dated September 17, 2001 **(Exhibit No. 3A)**

       B.    Transcribed Statement of Claudia Pinales
             Dated September 17, 2001 **(Exhibit No. 3B)**

       A.    Transcribed Statement of Sylvia Pinales Trevino
             Darted September 17, 2001 **(Exhibit No. 3C)**

       D.    Transcribed Statement of Carlos Luis Trevino Cisneros
             Dated September 17, 2001 **(Exhibit No. 3D)**

E.    Transcribed Statement of Alejandro Guerrero Trevino
      Dated September 17, 2001 **(Exhibit No. 3E)**

4.)    The following is a description of documents and there believed location
       which are not currently in the possession of the Plaintiff/Petitioners but
       have been ordered on all the Plaintiff / Petitioners and are believed to be
       as follows:

| | |
|---|---|
| Carlos Trevino | Valley Regional Medical Center<br>First Rio Valley Medical P.A.<br>Dr. A Betancourt |
| Sylvia Pinales | Valley Regional Medical Center<br>First Rio Valley Medical P.A. |
| Elsa Guerrero | Valley Regional Medical Center<br>First Rio Valley Medical P.A. |
| T.D.P.S. | Personell files on Juan Garza are to be obtained<br>through Discovery and are in the possession of the<br>State of Texas |

**26 ( a ) ( 1 ) ( C )**    A computation of any category of damages claimed by
the Disclosing     Party, making available for
inspection and copying as under Rule 34 the
documents or other evidentiary material, not
privileged or protected from Disclosure, on which
such computation is based.

Pending on final expert review of the medical records in this case a figure will be
provided for each Plaintiff / Petitioner.

**26 ( a ) ( 1 ) ( D )**    For inspection and copying as under Rule 34 any insurance
agreement under which any person carrying on an insurance
Business may be liable to satisfy part or all of the judgement
which may be entered in    the action or to indemnify or
reimburse for payments made to satisfy the judgement.

None at this time

Respectfully submitted,


By:_____

Reynaldo Garza, III
Attorney at Law
State Bar No.: 24008806
Fed Id No.: 23747
680 E. St. Charles, Ste. 110
Brownsville, Texas   78520
Tel. (956) 574-9502
Fax. (956) 574-9506

ATTORNEY FOR PLAINTIFF/
PETITIONERS


# CERTIFICATE OF SERVICE

I, Reynaldo G. Garza, III, Do hereby certify that a true and correct copy of the foregoing, **Rule 26(a)(1) Disclosures**, were served upon all counsel of record in accordance with the Federal rules of Civil Procedure by Certified Mail Return Receipt Requested on this the 30th day of December , 2002, at the following addresses:

Carlos Lopez
Howard Baldwin
Michael T. McCaul
Phillip E. Marrus
STATE OF TEXAS ATTORNEY
GENERAL'S OFFICE
P.O. Box 12458, Capitol Station
Austin, Texas 78711


_____
Reynaldo G. Garza, III

# EXHIBIT NO. 1

# TEXAS DEPARTMENT OF PUBLIC SAFETY

**5805 N. LAMAR BLVD – BOX 4087 – AUSTIN, TEXAS 78773-0001**
**(512) 424-2000**



**THOMAS A. DAVIS, JR.**
**DIRECTOR**

**DAVID McEATHRON**
**ASST. DIRECTOR**

**FRANKIE WALLER**
**ASST. DIRECTOR**



**COMMISSION**
**COLLEEN McHUGH**
*CHAIRMAN*

**ROBERT B. HOLT**
**JAMES B. FRANCIS, JR.**
**COMMISSIONERS**

December 4, 2001

Mr. Carlos Luis Trevino Cisneros
2425 Bernard, Apt. 37-A
Brownsville, Texas 78520

Dear Mr. Cisneros:

This is in reference to the administrative inquiry conducted as a result of the personnel complaint that you initiated against Trooper Raul Garza.

The inquiry revealed that Trooper Garza was assisting the U.S. Border Patrol during a pursuit situation. The description of the suspect vehicle given to Trooper Garza by the Border Patrol, matched your vehicle very closely and caused him to conduct the traffic stop. It was quickly determined that Trooper Garza, Trooper Trevino, and Trooper Lopez had stopped the wrong vehicle. The suspect vehicle was approximately two miles in front of you, and was in the process of being stopped by other officers.

The inquiry did not substantiate your allegations of misconduct by Trooper Garza; therefore, no further departmental action will be taken regarding this matter. I apologize for any inconvenience this may have caused you.

Sincerely,

*Charles L. Graham*

Charles L. Graham, Chief
Traffic Law Enforcement

CLG:SEC:sj

cc: Major Artemio Garza
    Captain Hector Ramos
    Lieutenant Mario Lopez
    Sergeant Felipe Escobedo
    Captain David Outon, Internal Affairs
    AI-01-111



THE STATE OF TEXAS
DEPARTMENT OF PUBLIC SAFETY
PO BOX 4087
AUSTIN TX 78773-0001

**OFFICIAL BUSINESS**
**STATE OF TEXAS**
STATE PENALTY
FOR PRIVATE USE



PRESORTED
FIRST CLASS



BUN3 78520

Mr. Carlos Luis Trevino Cisneros
2425 Bernard, Apt. 37-A
Brownsville, Texas 78520

# EXHIBIT NO. 2A

## PENAL CODE

**Sec. 37.02. Perjury.** (a) A person commits an offense, if with intent to deceive and with knowledge of the statement's meaning:

(1) he makes a false statement under oath or swears to the truth of a false statement previously made and the statement is required or authorized by law to be made under oath; or

(2) he makes a false unsworn declaration under Chapter 132, Civil Practice and Remedies Code.

(b) An offense under this section is a Class A misdemeanor.

**Sec. 37.03. Aggravated Perjury.** (a) A person commits an offense if he commits perjury as defined in Section 37.02, and the false statement:

(1) is made during or in connection with an official proceeding; and

(2) is material.

(b) An offense under this section is a felony of the third degree.

## TEXAS GOVERNMENT CODE

### Complaint Against Law Enforcement Officer or Firefighter

**Sec. 614.022. Complaint to be in Writing and signed by Complainant.** To be considered by the head of a state agency or by the head of a fire or police department, the complaint must be: (1) in writing; and (2) signed by the person making the complaint.

**Sec. 614.023. Copy of Complaint to be Given to Officer or Employee.**

(a) A copy of a signed complaint against a law enforcement officer, firefighter, or police officer shall be given to the officer or employee within a reasonable time after the complaint is filed.

(b) Disciplinary action may not be taken against the officer or employee unless a copy of the signed complaint is given to the officer or employee.

Acts 1993, 73rd Leg., Ch. 263, Sec. 1, eff. 9-1-93

## PERSONNEL COMPLAINT
## AFFIDAVIT

STATE OF __TEXAS_____

COUNTY OF __CAMERON_____

Before me, the undersigned authority in and for the State of __TEXAS_____ , on this day personally appeared __CARLOS TREVINO_____ , who, after being by me duly sworn, deposed and said:

My name is __CARLOS TREVINO_____ . I am __42__ years of age and my date of birth is __11-04-58_____ .

3-17-00

ANNEX #7
Page 4 of 4

01.07.00.00A

**Affidavit of** _____
**Page** _____ **of** _____

See Attached.



I have read the above statement consisting of ___2___ page(s), which is based on my personal knowledge, and it is true and correct.

Subscribed and sworn to before me, the undersigned authority, on this the _28_ day of _August_ , A.D. _2001_ .

Notary

8-12-98

STATE OF TEXAS          §

COUNTY OF CAMERON   §

BEFORE ME, the undersigned authority, a Notary Public in and for Cameron County, Texas, on this day personally appeared, Carlos Trevino, who after by me being sworn did depose and say:

My name is Carlos Trevino  I am here today at the Law Office of Garza & Salinas, L.L.P. to make my statement against the authority in Falfurias. The DPS where physically and verbally violent towards my family and me  On or about July 22, 2001 at around 4:00 p.m., they assaulted my family and me in many ways, they did everything from pushing, shoving, putting there guns on our heads, and hand cuffing me in a brutal matter when we were the wrong target. My family and I are very placid family  As well as hard working and with a lot of dignity. I have lived in the United State and I have never been arrested nor have I ever gotten a ticket. I have been working in Lopez Supermarket for many years.

On or about July 22, 2001 at around 4:00 p.m., I was driving by Falfurias in my 1997 Ford F150. extended cab with my wife (Sylvia Trevino), sister (Elsa Trevino), niece (Claudia Pinales) and nephew (Alejandro Guerrero) when suddenly I saw many government cars go by. I slow down thinking there was a big accident just right in front. My family and I speculated the worst that someone was in a big accident and we hoped everything was okay. As I continued to drive I had already reduce my speed, when suddenly I saw the officers putting a long peace of rug with nails. I automatically stopped. The officers run towards my truck and start assaulting, pushing and grabbing us like if we were criminals. I tried asking them what is going on? My family and I never resisted arrest. My family and I were very scared and we did as were told at all times. DPS, Constables, Sherriffs, Border Patrol and investigators with civil clothing were there at the scene  They put guns to our heads. Officers had my wife, sister, niece and nephew on there knees. I was very scared and kept yelling to my family to please do everything they were told. They had me handcuffed and face down to the road pavement. It was a very hot day, my face was burning so I tried keeping my face up when finally they picked me up. I kept telling the officers they were wrong that were falsely accusing us. Then suddenly they got a call in the radio and let us go without giving us an explanation to what went wrong

We all get up and get in my truck and continue driving, when we see the same officers doing the same to another family  I stop and approach an officer asking him what went on back there. He tells me that it was a false alarm and that they thought it was my truck  The truck they had stopped was very different from my truck. I also asked him why they had just left us out there without asking us if we were okay nor that they were sorry for the misunderstanding. I then approached the Border Patrol and Constables and they told me that they had nothing to do with what went on back there that they were called in for just back up because DPS was going to do a bust. They gave me there names and license plates so that I can see they were not lying

These people have caused my family and I a lot of emotional distress and bodily injury  When we arrived to our home in Brownsville, my wife, sister and I could not stand the pain from all the strangling and pushing. My wife when the officer forced her to get of the truck she stepped wrong and hurt her ankle and leg, my sister is hurt from her back and I am hurt from my neck  The pain was so strong we had to go to the hospital. In the

hospital they told us that we had some ligaments torn. My wife has high blood pressure and my sister is a diabetic, I was afraid something could of happened to them with all this racket  As to my niece, her pants tore and she felt embarrassed with all officers and people just looking at her  My nephew he has felt very emotional distressed to what happened. I think these people did us wrong. My family and I are very hurt and upset at the way we were treated. DPS treated us like dogs. I think dogs are probably treated better than we were.

The reason I am doing this affidavit is because I am ver disturbed about this incident. I would not want this to happen to anyone. This is very upsetting and embarrassing. My family and I have retained the services of Garza & Salinas, L.L.P. Should you have any questions please feel to contact my attorney Reynaldo G Garza, III at 680 E. St. Charles, Ste. 110, Brownsville, TX 78520, 956-574-9502.

I would like to state that I gave this statement under my own free will. I have not been threatened or promised anything in return for my statement. My statement was read to me in Spanish and I find it to be true and correct.


Carlos Trevino


SUBSCRIBED AND SWORN TO BEFORE ME, by the said Carlos Trevino on this the _28_ day of _August_ , 2001.


Notary Public in and for Cameron County, Texas

# EXHIBIT NO. 2B

ANNEX #7
Page 4 of 4

01.07.00.00A

Affidavit of _____
Page _____ of _____

 

I have read and acknowledge the complaint of Carlos Trevino
I hereby join in the complaint and state that it is a true and
correct rendition of the events that occured that day.
    The statement of Carlos Trevino is attached hereto and is
in corporated for all purposes.

I have read the above statement consisting of ___1___ page(s), which is based on my personal knowledge,
and it is true and correct.

Subscribed and sworn to before me, the undersigned authority, on this the _____ day of _____ ,
A.D. _____ .

Notary

8-12-98

# EXHIBIT NO. 2C

Affidavit of _____
Page _____ of _____


I have read and acknowledge the complaint of Carlos Trevino. I hereby join in the complaint and state that it is a true and correct rendition of the events that occured that day.

The statement of Carlos Trevino is attached hereto and is in corporated for all purposes.


I have read the above statement consisting of ___1___ page(s), which is based on my personal knowledge, and it is true and correct.

Subscribed and sworn to before me, the undersigned authority, on this the _2'8__ day of _August_, A.D. _2001_ .

_____
Notary

8-12-98

# EXHIBIT NO. 2D

ANNEX #7
Page 4 of 4

01.07.00.00A

Affidavit of _____

Page _____ of _____


        I have read and acknowledge the complaint of Carlos Trevino.
I hereby join in the complaint and state that it is a true and
correct rendition of the events that occured that day.
        The statement of Carlos Trevino is attached hereto and is
in corporated for all purposes.


I have read the above statement consisting of ___1___ page(s), which is based on my personal knowledge,
and it is true and correct.


Subscribed and sworn to before me, the undersigned authority, on this the _____ day of _____ ,
A.D. _____ .


Notary

8-12-98

# EXHIBIT NO. 2E

ANNEX #7
Page 4 of 4

01.07.00.00A

Affidavit of _____
Page _____ of _____


     I have read and acknowledge the complaint of Carlos Trevino
I hereby join in the complaint and state that it is a true and
correct rendition of the events that occured that day.
     The statement of Carlos Trevino is attached hereto and
is  in corporated for all purposes.


I have read the above statement consisting of ___1___ page(s), which is based on my personal knowledge,
and it is true and correct.

_____

Subscribed and sworn to before me, the undersigned authority, on this the ___ day of _____ ,
A.D. _____ .

_____
Notary

8-12-98

# EXHIBIT NO. 3A



*WESLACO HIGHWAY PATROL*
*2812 S. INTERNATIONAL BLVD./P.O. BOX 762*
*WESLACO, TEXAS 78596*
*PHONE NO. 956-969-2987   FAX NO. 956-969-4979*
SGT. AREA 3C03

ATTENTION: _Reynaldo Garzatti_

LOCATION: _Law Firm_

PHONE/FAX NO: _956-574-9506_

TOTAL NO. OF PAGES INCLUDING COVER SHEET: _9_

COMMENTS: _Elsa Guerrero ; Claudia Pinales_
_Affidavits_

FROM:

☑ FELIPE ESCOBEDO, SERGEANT          ☐ TRP. RAUL GARZA
                                      ☐ TRP. SANTA ANA
☐ RAQUEL FUENTES, CORPORAL           ☐ TRP. ARTEAGA
                                      ☐ TRP. ROMEO GARZA
☐ NELLY VALADEZ, ADM. TECH.          ☐ TRP. BARRERA
                                      ☐ TRP. ZAMORA
☐ ANDREA RAZO, RECEPTIONIST          ☐ TRP. GUAJARDO
                                      ☐ TRP. MONTEMAYOR
☐ NORMA GRACIA, WARRANT ADM. TECH. I ☐ TRP. MALDONADO

**PLEASE CALL TO CONFIRM THAT YOU HAVE RECEIVED THE FAX.**

DEPART...ENT OF PUBLIC SAFETY – Sta.. of Texas
AFFIDAVIT

# THE STATE OF TEXAS
# COUNTY OF    HIDALGO

Before me, the undersigned authority in and for said County and State, on this the 17th day of September, 2001 personally appeared,        **Elsa Guerrero** _____ who, after being by me duly sworn, deposes and says:

My name is        **Elsa Guerrero** _____ . I am of sound mind, over 18 years of age, and competent to give this affidavit.


**Sergeant Felipe Escobedo will be "Escobedo" throughout the affidavit.**

**Julieta Kowalski will be "Translator" throughout the affidavit.**

Escobedo:  Today is Monday, September the 17th 2001.  The time is 3:50 p.m.  My name is Felipe Escobedo. I am the Highway Patrol Sergeant in Weslaco.  I am at the law office of Garza & Salinas, located at 680 E. St. Charles, Suite #110, Brownsville, Texas. With me is Mr. Reynaldo Garza III, Julieta Kowalski, who will be the interpreter and Elsa Guerrero, who was a passenger in Mr.Trevino's vehicle on July 22nd, 2001.

Escobedo:  Mrs. Guerrero, please state your name.

Translator:  Elsa Guerrero.

Escobedo:  What is your address?

Translator: 2443 Carneci, Apt. B.

Escobedo:  In Brownsville?

Translator:  Yes.

Escobedo:  On July 22nd, 2001 at about 4:00 p.m., were you a passenger in Mr. Trevino's vehicle?

Translator:  Yes.

Escobedo:  Where were you sitting?

Translator:  The truck is double cabin.  I was going on the back seat because in front my sister was sitting. On the back seat it was me, my son, and my niece.

Escobedo:  Were you behind the driver?

Translator:  No.  On my sister-in-law's side, on the passenger side.

Escobedo:  Can you tell me what happened when you were stopped—when the vehicle was stopped on U.S. 77?

Translator: Yes. We were coming from San Antonio and we were having conversations, very calm. Then, we arrived to that place and we started seeing that cars were passing by, patrols. My son tells my brother and says, "You know, Uncle, something is happening because why are all these cars passing by?" We kept on going like for an hour. And then my son tells my sister-in-law, "Who is more powerful?" They that were driving the white cars with black or the Sheriff's that were the ones who were getting closer. Then my brother says, "You know what, there is something because there are two cars that look kind of far away that were on the shoulder of the road." And then my son says, "You know what—yes, I think it's an accident." When my brother sees that, well he was going to the limit, but he was lowering the speed. As we were getting closer when we saw these two cars, then when we were getting closer to that white car, he gets down off the car and he throws a thing across the road. My son says, "Stop, Uncle!" because we were going to turn over. When that thing was there I thought that maybe they were going to check the license or something. They throw that thing, I don't know how, the name of it. That's when my brother puts the brakes on and then we all raised our hands and asked what was happening. When I was coming on the side because the seat is very uncomfortable, I turn over and that's when my neck got hurt and also my waist. I got very hysterical because I have high blood pressure and I also have sugar. When they throw that thing, the man pulls the gun out.

Escobedo: Where was this man?

Translator: The same man that threw that thing over. When we turn, it was like that of people, the Border Patrol, all those people and all had weapons. The helicopter was also there. That same guy that throws the thing on comes around with a gun. My brother, we stayed with our hands like that because we didn't do anything. My brother rolls down the window a little bit and then the man grabs him from here and he throws him to the floor and talking—we don't understand English, but my brother does—and saying, cursing, but we didn't know what he was saying.

Escobedo: Where did the Trooper grab your brother?

Translator: From the neck.

Escobedo: Restarting the tape. It's 4:00 p.m.

Attorney: The question I believe was, "Where did he grab your brother?"

Translator: From the neck and then he took him down to the pavement. He threw him facing down and the pavement was boiling. It was 4:00 o'clock in the afternoon and it was very hot.

Escobedo: Did they ask you, did they order you to step out?

Translator: No, nobody. They left us there like the worst.

Escobedo: Did any of the officers grab you to take you out of the truck?

Translator: After they put the handcuffs on my brother, they left him there thrown. That same man comes by the side of the passenger side, he opens the door and he gets my sister-in-law out.

Escobedo: Did he grab her?

Translator: He makes my sister-in-law go to the floor just like that.

Escobedo: Did he grab your sister?

Translator: No. He opened the door and he told my sister to get down and when she was already down, to throw herself on the floor. By that time, my shoes were off. And you see how the double cabin has two doors, and then he opens the door. By that time, I was all hysterical. As I was getting down, I told him to

2

wait for me because I was putting my shoes on and he said no, he was closing the door. And then he told me, "Throw yourself to the floor!" By that time, I was already feeling very bad. I was not feeling well because I—since I was in the truck, I was not feeling well. And then when he tells me to throw myself to the floor, I turn and I see the grass. I asked him if on the grass and then he tells me, "Right there, on the floor!" And then when I knelt down, when I fell—there was a branch with a lot of thorns. All of them were in me, I was full of them and I was crying and crying and crying. And then they took my son out. Well, they didn't touch him, but they also told him the same thing—to throw himself on the floor.

Escobedo: Did any of the officers involved grab you all—you or the passengers?

Translator: No, not like that, but only all of them pointing right here to you. My brother would yell at them, "I want an explanation—why? What did we do?" Then my son would tell us, "Do what they say," for us to do whatever they were asking for. And I'm embarrassed to say this, but I even peed, urinated. The last one that they took out was my sister-in-law's niece. When we were all laying down just like animals, my brother was burning from the face. But my brother would tell us to communicate with him and we were all like that.

Escobedo: With whom?

Translator: My brother would say, "Do you know Conrado Cantu?" because my brother knows him, or "Mr. Garza?" to see what was going on, to see what they would answer. Nobody would say anything. They left us there, I don't know how many minutes, I'm not sure how many minutes. I don't remember.

Escobedo: Did you ask the officers, after it was over, for an ambulance?

Translator: They was no time for anything. They were all there, but always pointing.

Escobedo: Did you tell them that you were injured?

Translator: No. They didn't anyone talk. My brother was the one asking them for an explanation—nothing.

Escobedo: When did you seek medical treatment?

Translator: Well, from there, we stood up by ourselves. My sister-in-law was the one that helped me get up because I couldn't get up myself. And they, each one of them got their car and they got into their car and they didn't say anything—nothing. And one of them was smiling and saying, like saying, we're stupid people. Now, if they were following us, if they had something—a report for us or something, why didn't they ask for an I.D. to find out if we were legal or not legal or check our truck, what we had in there or our purses. They didn't approach us—nothing at all. My brother was—when all the cars started to circulate, they didn't say anything to us. The least that they could have asked us for was an apology—give us an apology or something. And the only one that stayed there was the one from the Border Patrol and he would tell them to stop, but they didn't listen. Nothing—we stayed there just like trash.

Escobedo: This terminates the interview with Elsa Guerrero.

Affidavit of __Elsa Guerrero__
Page __4__ of __4__

I have read the above statement consisting of __3__ page(s), which is based on my personal knowledge, and it is true and correct.

_____

Subscribed and sworn to before me, the undersigned authority, on this the _____ day of _____ , A.D. 20 _____ .

_____
Notary Public in and for
Hidalgo County, Texas.

# EXHIBIT NO. 3B

### DEPARTMENT OF PUBLIC SAFETY – State of Texas
### AFFIDAVIT

## THE STATE OF TEXAS
## COUNTY OF   HIDALGO

Before me, the undersigned authority in and for said County and State, on this the 17th day of September, 2001 personally appeared,        **Claudia Yvette Pinales**                              who, after being by me duly sworn, deposes and says:

My name is        **Claudia Yvette Pinales**                            .  I am of sound mind, over 18 years of age, and competent to give this affidavit.

**Sergeant Felipe Escobedo will be "Escobedo" throughout the affidavit.**

**Julieta Kowalski  will be "Translator" throughout the affidavit.**

Escobedo:  Today is Monday, September the 17th 2001.  The time is 4:10 p.m.  I am still at the office of Reynaldo G. Garza III, 680 E. St. Charles, Suite #110, Brownsville, Texas. With me is Julieta Kowalski, who will be the interpreter and we will be interviewing Claudia Pinales.

Escobedo:  Claudia, what is your full name?

Translator:  Claudia Yvette Pinales.

Escobedo:  And your address?

Translator:  2425 Bernard.

Escobedo:  How old are you?

Translator:  21.

Escobedo:  And your phone number?

Translator:  504-6351.

Escobedo:  Your date of birth?

Translator:  June 18, 1980.

Escobedo:  Were you a passenger in Mr. Trevino's vehicle on July 22nd at about 4:00 p.m.?

Translator:  Yes.

Escobedo:  Where were you sitting?

Translator:  Behind my uncle.

Escobedo:  The driver?

Translator:  Yes.

Escobedo: So, you were on the left rear?

Translator. Yes.

Escobedo: Where were you all coming from?

Translator: We were coming from visiting my cousin from San Antonio.

Escobedo: And where were you traveling to?

Translator: We were coming to our house, at the house in Brownsville.

Escobedo: What route did you take from San Antonio to Brownsville?

Translator: The main highway that goes to San Antonio. I don't know the name.

Escobedo: Did you pass by Falfurrias, Texas?

Translator: Is it Falfurrias? It's on the side. I'm not sure.

Escobedo: What happened when you were on U.S. 77 in Willacy County?

Translator: Where the things happened?

Escobedo: Yes.

Translator: The police stopped us and we didn't know that it was because of us. And what we saw is that suddenly units were passing by and then suddenly they threw a thing and my uncle at that moment, he reacted and my cousin said for him to stop because it was for us—because of us.

Escobedo: When you were confronted by the officers, what happened?

Translator: One of the officers stopped at the side of us and he was the one who took my uncle out. And he didn't ask him to get down, but he only opened the door and he forced him to get down. And from the other side, they were also yelling at us for us to get down. And then my aunt got down and immediately, she threw herself on the floor.

Escobedo: Who is your aunt?

Translator: My aunt, Sylvia Trevino.

Escobedo: Who was asked to get down after Sylvia Trevino?

Translator: We got down—the ones that were going on the back.

Escobedo: Sylvia Trevino got down first, and then who?

Translator: And then Elsa got down, Alejandro and I was the last one.

Escobedo: How did they ask you to step out?

Translator: They were yelling at us to get down and for us to throw ourselves on the floor. We threw ourselves on the floor and Alejandro and I were kneeling and then they told us that we had to get down.

2

Escobedo:  Who was using obscene language?  Was it Troopers or who.

Translator:  The ones that are dressed in brown.  I don't know.

Escobedo:  Like my uniform that I'm wearing?

Translator:  Yes.

Escobedo:  Are you sure that those are the ones that were using obscene language?

Translator:  Yes.

Escobedo:  Were you injured in the incident?

Translator:  I was not injured.  The only thing was that when I threw myself, the rocks were so hot that I kind of felt injured because of the hotness of the stuff.

Escobedo:  Did you seek medical treatment?

Translator:  No.

Escobedo:  Mr. Trevino states that your pants were torn?

Translator:  Yes.

Escobedo:  How did that happen?

Translator:  I think that it was on the moment that I knelt down.  That's when my pants got torn.  And then when I was kneeling, I found out that one of the persons that was on the back was laughing, but I never imagined that my pants were torn.

Escobedo:  Was he laughing or just looking?

Translator:  Like looking and grinning.

Escobedo:  Can you describe Mr. Trevino's truck?

Translator:  It's a green truck, F-150, 1 ½ cabin.

Escobedo:  How long was the whole incident?  How long did it take?

Translator:  Like half an hour—exactly, I don't know.

Escobedo:  Did you talk to any officers at the scene?

Translator:  Not at any moment because my uncle would tell us not to say anything—that we had to stay quiet.

Escobedo:  So you yourself didn't talk to any officers?

Translator:  No.

Escobedo:  Did anyone there ask for an ambulance?

Translator:  No.

3

Affidavit of   **Claudia Yvette Pinales**
Page   **4**          of   **4**

Escobedo:  Did anyone there advise officers that they were injured?

Translator:  No.

Escobedo:  Did any of the officers grab you?

Translator:  No.

Escobedo:  That terminates the interview with Claudia Pinales.

I have read the above statement consisting of   **4**      page(s), which is based on my personal knowledge, and it is true and correct.

_____

Subscribed and sworn to before me, the undersigned authority, on this the                    _____ day
of   _____ , A.D. 20       _____  .

_____
Notary Public in and for
Hidalgo County, Texas.

.

# EXHIBIT NO. 3C



*WESLACO HIGHWAY PATROL*
*2812 S. INTERNATIONAL BLVD./P.O. BOX 762*
*WESLACO, TEXAS 78596*
*PHONE NO. 956-969-2987   FAX NO. 956-969-4979*
*SGT. AREA 3C03*

ATTENTION: _Reynaldo Garza III Law firm_

LOCATION: _____

PHONE/FAX NO: _956-574-9506_

TOTAL NO. OF PAGES INCLUDING COVER SHEET: _11_

COMMENTS: _Sylvia Pinales ; Carlos Trevino –_
_Affidavits_

FROM:
☑ FELIPE ESCOBEDO, SERGEANT            ☐ TRP. RAUL GARZA
                                        ☐ TRP. SANTA ANA
☐ RAQUEL FUENTES, CORPORAL             ☐ TRP. ARTEAGA
                                        ☐ TRP. ROMEO GARZA
☐ NELLY VALADEZ, ADM. TECH.            ☐ TRP. BARRERA
                                        ☐ TRP. ZAMORA
☐ ANDREA RAZO, RECEPTIONIST            ☐ TRP. GUAJARDO
                                        ☐ TRP. MONTEMAYOR
☐ NORMA GRACIA, WARRANT ADM. TECH. I   ☐ TRP. MALDONADO

**PLEASE CALL TO CONFIRM THAT YOU HAVE RECEIVED THE FAX.**

## DEPARTMENT OF PUBLIC SAFETY – State of Texas
## AFFIDAVIT

### THE STATE OF TEXAS
### COUNTY OF    HIDALGO

Before me, the undersigned authority in and for said County and State, on this the 17th day of September, 2001 personally appeared,    **Sylvia Pinales de Trevino**    who, after being by me duly sworn, deposes and says:

My name is    **Sylvia Pinales de Trevino**    . I am of sound mind, over 18 years of age, and competent to give this affidavit.

**Sergeant Felipe Escobedo will be "Escobedo" throughout the affidavit.**

**Julieta Kowalski will be "Translator" throughout the affidavit.**

Escobedo:  Today is September the 17th 2001.  The time is 3:30 p.m.  My name is Felipe Escobedo. I am the Highway Patrol Sergeant in Weslaco.  I am at office of Reynaldo G. Garza III at 680 E. St. Charles Street in Brownsville, Texas. In the room is Mr. Reynaldo Garza, Julieta Kowalski, who will be translating and I will be interviewing Mrs. Trevino.

Escobedo:  Mrs. Trevino, state your full name please.

Translator:  Sylvia Pinales de Trevino.

Escobedo:  What is your address?

Translator:  2425 Bernard, Apt. #37-A, Brownsville.

Escobedo:  How old are you?

Translator:  I'm 41 or 42 approximately.

Escobedo:  What is your phone number?

Translator:  504-6351.

Escobedo:  Are you employed?

Translator:  Yes.  I work in the mornings from 7:00 a.m. to 10:00 a.m.

Escobedo:  What is your employment?  What do you do?

Translator:  I give assistance to elderly people in the program—Sunglo Program is the name of the company.

Escobedo:  Do you understand and write the English language?

Translator:  I understand very little.

Escobedo: I'm going to ask you some questions in regards to an incident that occurred on July 22nd, 2001 around 4:00 p.m. on U.S. 77 in Willacy County. Mrs. Trevino, what can you tell me that happened when your husband stopped the truck on U.S. 77 in Willacy County?

Translator: When they stopped my husband, what we felt was a little scared because of the way they stopped us. The reason why we were scared is because they didn't advise us of when they were gonna stop us and they put that thing to stop us. I don't understand English. The reason why we were scared is because they didn't make a sign for us to stop. They were trapping us like if we were trying to escape and we were delinquents.

Escobedo: When they asked you to step out of the vehicle, how did they say that?

Translator: Well, the vehicle stopped, and then they get down with the guns pointing at us and saying bad words that I don't understand, but I know that they are bad words.

Escobedo: When you stepped out of the vehicle, did any of the Troopers grab you?

Translator: No. He didn't grab me, but by the way that he was yelling I was so scared. Right now, only by remembering, my blood gets high and my ears...and then he tells me a lot of curses at me and then he throws me to the floor. When I get down off the truck because it's a big truck, a high truck, my right foot twists.

Escobedo: When you stepped out of the vehicle, what happened then?

Translator: When I got down of the truck. But it was because I was so terrified I made a bad—I stepped the wrong way and then they tell me to throw myself on the floor.

Escobedo: What leg did you injure?

Translator: The right leg, because he didn't give me an opportunity to get a little bit ahead of the truck.

Escobedo: Were you asked to lie on the pavement?

Translator: For me to throw myself, for me to lay down, but he didn't give me an opportunity to talk.

Escobedo: Did you lie down on the pavement?

Translator: I didn't take another step. At that moment, I threw myself down because he didn't give me a chance.

Escobedo: Were you face down?

Translator: Yes. I didn't see anything, nowhere.

Escobedo: How long were you facedown on the pavement?

Translator: Well, to me, it was an eternity. It was a long time. I don't know if it was fifteen minutes.

Escobedo: Did they ask you to move to the grassy area?

Translator: After a long time when they had my husband, mistreating him.

Escobedo: How long did the whole incident take?

Translator:  To me, it was an eternity.  I didn't check the time and then they told me to kneel down on the grass.

Escobedo:  Did any of the Troopers or officers shove you?

Translator:  No, but for me to kneel down, I'm a heavy person and my foot was in pain but it was an order for us to stay kneeling down there.

Escobedo:  What injuries did you sustain?

Translator:  Right now I have torn ligaments and I still don't have the other results.  I don't know what's going to be there.

Escobedo:  Can you describe your husband's vehicle?

Translator:  The truck?

Escobedo:  Yes.

Translator:  It's an F-150 green truck, '97, color emerald green.

Escobedo:  Did you advise the officers at the scene that you were injured?

Translator:  No, because I asked them what was happening and they told us not to speak.  They didn't give us an opportunity for us to tell them anything because they thought that we were the persons that they were looking for.

Escobedo:  Did you ask the officers for an ambulance?

Translator:  No, because they didn't give us an opportunity.  They left us there kneeling down and then they got far away from us.

Escobedo:  What words were used against you?

Translator:  Mother—I don't know what other big word that I cannot pronounce.

Escobedo:  Was it obscene language?

Translator:  Very ugly.  I've heard it on TV.

Escobedo:  Can you say it?

Translator:  Well, "mother fuck you", something like that.

Escobedo:  Mrs. Trevino, is there anything else that you would like to say?

Translator:  What I would like to say is that never in my life would I like to live through this again, because not only were we terrified, but we thought that maybe we were going to be shot.  Only by seeing the way they were mistreating my husband—to me, they were hitting him.  By feeling helpless, because they didn't let us do anything and they were cursing at us.  Also, it was so embarrassing that all the cars were passing by and looking at us being thrown on the floor and then kneeling down—all looking at us.  Up to date— because we have a daughter living in San Antonio—when we pass through that section it provokes a feeling of puking because we remember what happened on that date.  Right now, while I'm telling you this,

3

Affidavit of **Sylvia Pinales de Trevino**

Page **4** of **4**

I lived there as if it was a movie because I never expected for this to happen and it seems like I am the person in that movie.  That's all I can say.

Escobedo:  Ok.  This terminates the interview with Mrs. Trevino.

I have read the above statement consisting of **4** page(s), which is based on my personal knowledge, and it is true and correct.

_____

Subscribed and sworn to before me, the undersigned authority, on this the _____ day of _____ , A.D. 20 _____ .

_____
Notary Public in and for
Hidalgo County, Texas.

4

# EXHIBIT NO. 3D

## DEPARTMENT OF PUBLIC SAFETY – State of Texas
## AFFIDAVIT

**THE STATE OF TEXAS**
**COUNTY OF    HIDALGO**

Before me, the undersigned authority in and for said County and State, on this the 17th day of September, 2001 personally appeared,      **Carlos Luis Trevino Cisneros**                who, after being by me duly sworn, deposes and says:

My name is      **Carlos Luis Trevino Cisneros**                     . I am of sound mind, over 18 years of age, and competent to give this affidavit.

**Sergeant Felipe Escobedo will be "Escobedo" throughout the affidavit.**

**Mrs. Julieta Kowalski will be "Translator" throughout the affidavit.**

Escobedo:  Today is September the 17th 2001.  The time is 2:35 p.m.  My name is Felipe Escobedo. I'm the Highway Patrol Sergeant in Weslaco.  I am at the law firm of Reynaldo G. Garza III at 680 E. St. Charles Street in Brownsville, Texas.  The phone number is 956/574-9502.  In the room is Mrs. Julieta Kowalski, 1900 E. Elizabeth, Apt. 1007, phone number 956/541-1444 who will serve as a translator during this interview.  Present is also Mr. Reynaldo Garza III, attorney for Mr. Carlos Trevino, and Mr. Trevino also is present.

Escobedo:  Mr. Trevino, I'm going to ask you some questions in regards to an incident that involved you and members of the Texas Department of Public Safety, U.S. Border Patrol, Constable units and Willacy County units.  This incident occurred on July 22nd, at about  4:00 p.m. on U.S. 77 in Willacy County, Texas.

Escobedo:  Mr. Trevino, what is your full name?

Translator:  Carlos Luis Trevino Cisneros.

Escobedo:  What is your address?

Translator:  2425 Bernard, Apt. 37-A.

Escobedo:  Where is this at?

Translator:  Brownsville.

Escobedo:  What is your date of birth?

Translator:  11-04-58.

Escobedo:  How are you employed?

Translator:  A.B. Lopez, from Los Fresnos.

Escobedo:  Do you understand English?

Translator: Very little.

Escobedo: I'm going to ask you some questions and have Mrs. Kowalski translate for you. Is that ok?

Translator: Yes.

Escobedo: First of all, can you tell me what happened on July 22nd around 4:00 p.m. when you were on U.S. 77 in the Combs area?

Translator: My family and I were coming from San Antonio. We were coming from 77 Street and we were passing Corpus Christi. We passed Corpus Christi. When we were at the entrance of Falfurrias, a Constable's unit was making a stop and I passed and I had my green light. More or less, when we were about to get to the checkpoint, units, DPS started passing by, and a Sheriff and some units are coming back from the opposite way that I'm going to—all the units with all the lights on. We kept on going and the comment that I made with my family was that ahead of the road, we were going to get involved or we were going to see an accident. We kept on going and approximately where the County of Willacy and Combs is, at the entrance, when we were exiting the freeway, we saw some units with the lights on. By then I told my family, 'Look, the accident is there.' The thing is that there was no accident and what was happening was that they were waiting for us. By this time, when I saw all the lights of the units, I lowered my velocity. When were getting close to them, an officer from the DPS throws a roll that they took down from a unit. It's like a roll that went through all the road with pins, nails. One of my nephews that was coming with us told us, "Stop, Uncle, because this is for us!" I stop, then they all get off the unit. Some of them were already off the unit. They start pointing at us with guns. My family and I were all scared before they got near the truck. I told them to do everything that they said. By this time, one of the units was parked just at the side of my truck. That officer gets down jumping, almost crossing the hood of the car. I'm trying to roll my window from my truck, in which my arms were always raised because they would never stop pointing at me—with words, with the little English I know that were not adequate either for me or for my family.

Escobedo: What words do you recall hearing from the Trooper?

Translator: Words like, "mother fucker". And other words that I don't understand very well and that I don't remember because we were so scared.

Escobedo: Are you sure that those were uttered by the Trooper that was closest to your truck?

Translator: The one that got out? Yes.

Escobedo: And then what happened?

Translator: Then I move to the front with my hands to the front of the truck and the officer goes over by my door. When he opens the door with his right hand he throws the hit. By the neck, he grabs me from the shirt and then he throws me to the floor. I fell down facing down with my hands over my body. Then, he took my arms back and he put the handkerchiefs on.

Escobedo: You mean the handcuffs?

Translator: Handcuffs—I'm sorry—handcuffs on. And the other officers take my family out of the car.

Escobedo: Ok. When you said that you fell on your stomach, were your arms beneath you or over you?

Translator: The first time that I fell my arms were like this.

Escobedo: Are you saying beneath you?

2

Translator: Yes.

Escobedo: How did the Trooper handcuff you?

Translator: When I was like that, he pulled my arms to the back and then he put them on. I was still facing down on the floor with my neck going up because I couldn't stand the heat of the pavement. By this time I told my family for them to do everything that they would say because I was afraid that they would do something to them because I saw them with a lot of anger and very accelerated. From then on, I didn't see my family again. I was on the side, my family was on the other side. By this time, one of the officers came in and was dressed as a normal person. I didn't know who he was and he asked me why was I trying to leave. What I answered was that I was not trying to escape from anything. He said that they were coming from Falfurrias where they stopped me. Then I said that in Falfurrias I don't have any business over there, and then he said, "Well, where are you coming from?" He asked me, "Where are you coming from?" I said, 'I'm coming from San Antonio.' After all this happened, they moved my truck to the side, they take the unit out. By this time, they already had my family kneeling down on the shoulder of the street. They take me up from where I was and they leave me sitting down with the handcuffs on the road. All the DPS officers and the Border Patrol gather together on one side and start talking to each other in English. By this time, my nephew who speaks English and understands it perfectly, was understanding everything that they were talking about in that little group that they had.

Escobedo: What is your nephew's name?

Translator: Alejandro Guerrero Trevino. Suddenly, he screams, "Uncle! They've messed up things for us!" "We're not the people who they are looking for—they made a mistake with us." Suddenly, one of the officers comes and I don't know—I was so nervous and so scared and I don't know who he was, takes off the handcuffs. Suddenly, they start getting on their units and they start leaving—everybody. I start looking around to every place and one of the units of the Border Patrol and I go over to them and I ask them what's happening. I want you to give me an explanation. He then tells me, "Sir, please I apologize— we didn't touch you." 'Well everybody's here. Somebody has to give me an explanation because this cannot stay like this.' Then the officer of the Border Patrol tells me, "Well, I'll give you my name, all my friends' names, my badge number." Then he tells me, "If you need anything, please look for us in Falfurrias. Our offices are over there." "The only thing that I can tell you is that you have a case." After that they left and then we came to our truck and then ahead in Harlingen, they had a truck. I stopped a little bit ahead, in front of them. They were the same officers that were with DPS that were there with that truck. Then I stop and I ask them for an explanation for what had happened with me and my family. By this time, the officer that comes to me—the one that took me out from my truck says, "Sir," he tells me, "I came here because they sent us the call that they had—the truck that we were looking for, was here." By this time, the truck was a lot different from my truck because this one was a Chevy pick-up with 1 ½ cabin and mine is a Ford pick-up truck with 1 ½ cabin and the color is green. Well, then after that, he gives me his card and he didn't give me an explanation for what happened or what he had told me. We kept on going to Brownsville. We were heading to the hospital because my wife, my sister and I—well, I had a pain on my neck and my wife had a like a ball on her ankle. On the X-rays that they took at the hospital, my neck was swollen and my wife had all the ligaments from the foot torn. Then we came home.

Escobedo: Mr. Trevino, who was in the vehicle with you?

Translator: My sister, Elsa Guerrero, Alejandro Guerrero, Claudia Pinales, my wife Sylvia Trevino and myself, Carlos Trevino.

Escobedo: Can you tell me where each one was sitting besides you?

Translator: My wife was in the front seat with me to the passenger's side. My sister, my nephew and my niece were on the back part of the truck.

Escobedo: Who was behind you?

Translator: In the truck? Ok. Claudia was on my back.

Escobedo: Who was in the middle in the back?

Translator: Alejandro.

Escobedo: When your truck was stopped—you say in your statement that your family was assaulted in many ways.

Translator: Exactly.

Escobedo: Can you tell me in how many ways they were assaulted?

Translator: Assaulted in the way how they treated them. My wife, who was the first one who got down—they were pointing at them with their guns, she got down all nervous, then her foot twists and they tell her to get down to the road. She had to throw herself facing down on the road. After that, they take the ones that are in the back and they do the same thing with them.

Escobedo: Mr. Trevino, you said that they, the Troopers or officers, did everything from pushing, shoving and putting their guns on their heads.

Translator: Yes.

Escobedo: Did you see this?

Translator: Even when we were on the truck, they were pointing at us.

Escobedo: When you say that they put their guns on their heads, what do you mean by that?

Translator: What I mean by this is the way they were taking us down. They open the doors and they never get their guns down.

Escobedo: But their guns never were on their heads?

Translator: Not touching the head, no.

Escobedo: You say in your statement that you were handcuffed in a brutal manner. How would you describe the way the Trooper handcuffed you?

Translator: Simply by the way that they get me down out of the truck. They throw me to the road without giving me any explanation. This to me was very rude because in the whole hour while they were following us and I say following because supposedly they were coming over me. They never put themselves to stop me, behind me at any moment. That's why I saw them passing over me, passing over me and they never put a signal or tell me to stop at any moment.

Escobedo: Did you see a Trooper behind you with the emergency lights just before you got to where the spike system was thrown across the road?

Translator: Never.

Escobedo:  In your statement you said that the officers ran towards your truck and started "assaulting, pushing and grabbing us like we were criminals."  Did the officers grab your family to get them out of your vehicle?

Translator:  I didn't get to see that because I was thrown on the floor of the road.  My sister, after they had been kneeling—she's a big and heavy person, said that she knelt down and then an officer came from the back and pushed her with the hand so that she could throw herself to the floor.  That, I can tell you, I didn't see it, but with how they were scared and with the shock and everything, they cannot be lying.  By this time, they take my truck and also the unit.  They have my family—my sister, my nephew, my niece kneeling down at the shoulder of the road and I was sitting down on the road still with the handcuffs.  And then they let all the traffic go that was coming.

Escobedo:  How long would you say that you were on the pavement with your face down?

Translator:  Exactly I wouldn't be able to tell you, but it was quite a while.

Escobedo:  What injuries did you sustain?

Translator:  How it looks, it could be in the M.R.I.  At the moment, I think that I have a fracture in one of the vertebrae of my neck.

Attorney:  Officer, I'll just tell you that we learned on Friday he has a herniated disk and may require surgery in his neck.

Escobedo:  At the scene, did you ask for an ambulance?

Translator:  We didn't ask for anything because like I tell you, they didn't tell us anything, they didn't give us an explanation and we didn't know.  What we felt at that moment—we were scared because of the shock that we went through.

Escobedo:  Can you describe your truck?

Translator:  It's a Ford F-150, 1 ½ cabin, color green.  And that day, when we got out of San Antonio so that we could save gas, I take the tailgate from the truck...

Escobedo:  Can you explain?

Translator:  I took the tailgate down so that I could save gas.

Escobedo:  Who in your family was injured as per your information?

Translator:  My wife and my sister that would complain of a pain in the back part or lower back part, I don't remember where.

Escobedo:  Mr. Trevino, have you spoken to me about this incident before today?

Translator:  When I went to the office of the man to ask for a report.

Escobedo:  You went to my office in Weslaco (July 27, 2001).

Translator:  Exactly.

Escobedo:  This terminates the interview with Mr. Trevino.  The time is 3:20 p.m.

Affidavit of    **Carlos Luis Trevino Cisneros**

Page    **6**    of    **6**

I have read the above statement consisting of    **5**    page(s), which is based on my personal knowledge, and it is true and correct.

_____

Subscribed and sworn to before me, the undersigned authority, on this the    _____ day of _____ , A.D. 20    _____ .

_____
Notary Public in and for
Hidalgo County, Texas.

# EXHIBIT NO. 3E



### WESLACO HIGHWAY PATROL
### 2812 S. INTERNATIONAL BLVD./P.O. BOX 762
### WESLACO, TEXAS 78596
### PHONE NO. 956-969-2987   FAX NO. 956-969-4979
### SGT. AREA 3C03

ATTENTION: _____*Reynaldo Garza III*_____

LOCATION: _____

PHONE/FAX NO: _____956-574-9506_____

TOTAL NO. OF PAGES INCLUDING COVER SHEET: _8_

COMMENTS: _____*Alejandro Trevino Affidavit*_____

_____

**FROM:**
☑ FELIPE ESCOBEDO, SERGEANT

☐ RAQUEL FUENTES, CORPORAL

☐ NELLY VALADEZ, ADM. TECH.

☐ ANDREA RAZO, RECEPTIONIST

☐ NORMA GRACIA, WARRANT ADM. TECH. I

☐ TRP. RAUL GARZA
☐ TRP. SANTA ANA
☐ TRP. ARTEAGA
☐ TRP. ROMEO GARZA
☐ TRP. BARRERA
☐ TRP. ZAMORA
☐ TRP. GUAJARDO
☐ TRP. MONTEMAYOR
☐ TRP. MALDONADO

**PLEASE CALL TO CONFIRM THAT YOU HAVE RECEIVED THE FAX.**

## DEPARTMENT OF PUBLIC SAFETY – State of Texas
## AFFIDAVIT

## THE STATE OF TEXAS
## COUNTY OF   HIDALGO

Before me, the undersigned authority in and for said County and State, on this the 17th day of September, 2001 personally appeared,     **Alejandro Guerrero Trevino**                      who, after being by me duly sworn, deposes and says:

My name is     **Alejandro Guerrero Trevino**                      . I am of sound mind, over 18 years of age, and competent to give this affidavit.


**Sergeant Felipe Escobedo will be "Escobedo" throughout the affidavit.**

**Alejandro Guerrero  will be "Guerrero" throughout the affidavit.**

Escobedo:  Today is Monday, September the 17th 2001.  The time is 4:27 p.m.  I am at the law firm of Reynaldo G. Garza III, 680 E. St. Charles Street, Suite #110 in Brownsville, Texas. In the room is Mr. Alejandro Guerrero who was a passenger in Mr. Trevino's vehicle on July 22nd and he is represented by Reynaldo Garza III.

Escobedo:  Mr. Guerrero, Alejandro, do you understand English?

Guerrero:  Yes, sir, I do.

Escobedo:  Please say your full name.

Guerrero:  Alejandro Guerrero Trevino.

Escobedo:  And what is your address?

Guerrero:  2443 Carneci, Apt. B.

Escobedo:  In Brownsville?

Guerrero:  Brownsville, Texas.

Escobedo:  Were you a passenger in Mr. Trevino's vehicle on July 22nd, 2001 at about 4:00 p.m.?

Guerrero:  Yes, sir, I was.

Escobedo:  Where were you all coming from?

Guerrero:  We were coming back from San Antonio.

Escobedo:  What route did you take from San Antonio?

Guerrero:  Highway 77.

Escobedo:  And you were traveling to...

Guerrero: Brownsville, Texas.

Escobedo: Ok. About what time did this incident take place?

Guerrero: It was around 3:30 to 4:00 o'clock.

Escobedo: Ok. Can you tell me in your words what happened there when the incident took place?

Guerrero: Ok, when we were coming down, driving down South 77, all of a sudden we see cars, State Troopers, and Sheriff's department cars following each other. So we assumed there was an accident up front.

Escobedo: Were they passing you?

Guerrero: Yeah. They passed us up. We assumed there was an accident so we were like—we were talking like oh, we might see—this could be an accident or something up front.

Escobedo: Were you traveling southbound?

Guerrero: Yes, sir.

Escobedo: On U.S. 77?

Guerrero: Yes, sir.

Escobedo: What was the nearest town that you were coming to?

Guerrero: I believe it was Willacy County where this whole incident happened. So we're heading down and we see all the lights, cars, pull up on the side, so I tell my uncle, slow down—you know—there might be an accident in the front. All of a sudden, I see—I believe it was a State Trooper—throw down the spikes and I told my uncle to stop, this is for us. So automatically we stopped and I say, you know what, just do whatever they tell us to do—we'll see what's going on. So we parked the truck and we see cops and Sheriffs and State Troopers like surrounding us with guns out, telling us to get off the truck. At no time, did we resist arrest or anything. A State Trooper comes around, pulls my uncle down, throws him on the floor, handcuffs him, yelling at us to get off the truck. My mom—well, big woman—they couldn't get off as easily as we could. They fell to the ground and they ordered them to stay on the floor, on the pavement. So I come down, I get down on my knees, and they're like, "Get on your stomach!" so I get down on my stomach and just follow whatever they told me to do. I didn't understand what was going on.

Escobedo: Who was driving the truck?

Guerrero: My uncle was—Carlos Trevino.

Escobedo: And who was on the right front side?

Guerrero: The right front side was my aunt, Sylvia Trevino, which was my uncle's wife.

Escobedo: And who was sitting in the back, behind the driver?

Guerrero: Behind the driver was Claudia, me in the middle and my mother on the right side.

Escobedo: When your uncle stopped the truck, can you describe the truck?

Guerrero: The truck? '97 Ford F-150.

Escobedo:  What color?

Guerrero:  Extended cab, green.

Escobedo:  Was the tailgate down?

Guerrero:  I believe it was.

Escobedo:  When was the first time that you saw police cars?

Guerrero:  Say, maybe five, ten miles before they actually threw down the spikes, they passed us up.  We passed up a car and they passed us.

Escobedo:  Did you pass through Falfurrias?

Guerrero:  Yes, sir.

Escobedo:  Did you see any patrol cars there?

Guerrero:  Yes.  I believe we did see a couple of cars parked, you know.

Escobedo:  Between Falfurrias and where the incident took place, did you see any other patrol cars passing by?

Guerrero:  Yes, sir.

Escobedo:  Several?

Guerrero:  Several—maybe say, two or three.

Escobedo:  On what road?

Guerrero:  On South 77.

Escobedo:  Ok.  Did you take 281 South from Falfurrias?

Guerrero:  I believe so.

Escobedo:  And then east on 186?

Guerrero:  I don't think so.

Escobedo:  Well, from 281 you had to go east on 186.

Guerrero:  Ok, well, yes.

Escobedo:  Did any patrol cars pass you then?

Guerrero:  I believe so—a couple of cars.  They never signaled us to stop or anything so we believed that there might have been an accident.

Escobedo:  What type of cars?

Guerrero:  I saw—the cars that I could recognize were State Troopers and Sheriff's Department.

3

Escobedo:  And was that on Texas 186?  The one that goes from 281 to . . ?

Guerrero:  Yeah.

Escobedo:  When you were on 77, and came upon the location of where your uncle stopped, you said that a Trooper got your uncle down.

Guerrero:  Yes.

Escobedo:  Ok.  Where was this Trooper parked?

Guerrero:  The Trooper—where was he parked?  Well, I believe that he was alongside of us.

Escobedo:  On what side?

Guerrero:  There were a couple of Troopers on the right hand side, up front and  a couple of Troopers on the left hand side, kind of surrounding the truck.

Escobedo:  Did the Trooper have his gun drawn?

Guerrero:  Yes.  They all did.

Escobedo:  Did you hear any obscene language?

Guerrero:  Yes, sir, I did.

Escobedo:  By whom?

Guerrero:  By a couple of them, actually.  We would ask them questions, and they would...

Escobedo:  When you say  a couple of them, you have to be specific.  Who used obscene language?

Guerrero:  Well, the man that pulled down my uncle was one of them.

Escobedo:  What did he say?

Guerrero:  "Get the fuck down, get on the floor."  I tried to ask him what's going on.  "Shut the fuck up and get down," and stuff like that.

Escobedo:  He said that?

Guerrero:  Yes and on the other side, "Get the fuck on the ground, get the fuck on the ground!"

Escobedo:  Are you sure it was a Trooper saying that or you just heard that?

Guerrero:  There was Troopers and Sheriffs saying that.

Escobedo:  Who said that?

Guerrero:  I believe it was all of them—that I saw—I believe.

Escobedo:  The Trooper that got your uncle down—how did he get him down?

Guerrero:  Uncle was not resisting—hands up, came up around the side with the gun drawn—pulled him down from the neck, threw him on the floor.  This is what I was able to see because I was seeing

4

everything from the middle, like looking up—handcuffed him. And I believe it was him and another man that just dragged him from the arms. That's how he tore his shirt.

Escobedo: When they handcuffed your uncle, how did he handcuff him?

Guerrero: They handcuffed him with the hands behind his back.

Escobedo: Did your uncle resist?

Guerrero: No, not at all.

Escobedo: How would you describe the way he handcuffed him?

Guerrero: Well, kind of violent because he was on the floor not resisting, and the cop—I guess it's routine, with a knee in the back—handcuffed him. After that, another officer came and assisted him, kind of dragged him towards the back of the truck.

Escobedo: Was he walking or being dragged?

Guerrero: Being dragged—trying to get up and being dragged.

Escobedo: So how long was your uncle on the pavement?

Guerrero: I say, 10 to 15 minutes. What do you mean? After being arrested?

Escobedo: Once he was handcuffed and then, when did the other officer come to move him?

Guerrero: As soon as the other man had handcuffed him. They kind of dragged him and sat him up against the truck.

Escobedo: So he wasn't laying on the pavement for a long time?

Guerrero: Not for a while—well, as long as it took them to handcuff him. They kind of did drag him.

Escobedo: Did any of the officers grab you or your fellow passengers?

Guerrero: No. They just told us to get on the ground and throw ourselves flat and it was burning up. I guess they didn't acknowledge that—that it was very hot. My mother was trying not come down. She's a big woman.

Escobedo: Was she laying on the ground? On the pavement?

Guerrero: Yes, laying on the pavement.

Escobedo: Were you injured in the incident?

Guerrero: I was not injured. My mother was, may aunt was and my uncle was. Claudia—her pants were torn. All I had was—they were just yelling at me. I was just trying to see what was going on.

Escobedo: Did they tell you what happened?

Guerrero: No explanations whatsoever—at all.

Escobedo: No one explained to you what happened?

Guerrero: No explanation.

Escobedo: At no time?

Guerrero: At no time. No apologies, no nothing. They left us there. Actually, a Border Patrol was trying to call them back and they said they had to respond to a call. The only one that had something to say or tell us was the Border Patrol officer right there at the time.

Escobedo: How long did the incident take?

Guerrero: Maybe—from beginning to end—say, 15 to 20 minutes approximately.

Escobedo: Did any one of your family members advise the officers that they were injured?

Guerrero: No, they didn't.

Escobedo: Did any members ask for an ambulance?

Guerrero: No, sir. We drove from here to the hospital because of pain.

Escobedo: What hospital?

Guerrero: I believe it's the one on Alton Gloor, Brownsville Medical Center here.

Escobedo: Brownsville? From the scene you went to the hospital?

Guerrero: From Willacy County to Brownsville.

Escobedo: And what hospital was that?

Guerrero: I think it was Brownsville Medical Center.

Escobedo: You said that no one grabbed you.

Guerrero: Me? No.

Escobedo: Nobody shoved you?

Guerrero: Nobody shoved me.

Escobedo: Nobody put their guns on your head?

Guerrero: Well, they did draw their guns towards me.

Escobedo: But they didn't put their guns on your head?

Guerrero: No.

Escobedo: Did they handcuff you?

Guerrero: No, sir, they didn't.

Escobedo: Did they handcuff the other passengers?

Guerrero: No, only my uncle.

6

Affidavit of __Alejandro Guerrero Trevino_____

Page __7_____ of __7_____

Escobedo:  Your uncle was the only one that was handcuffed?

Guerrero:  Yes, sir.

Escobedo:  Is there anything else that you wanted to add?

Guerrero:  No.  That was it.

Escobedo:  That terminates the interview with Alejandro Guerrero Trevino.  The time is 4:38.

I have read the above statement consisting of __7__ page(s), which is based on my personal knowledge, and it is true and correct.

_____

Subscribed and sworn to before me, the undersigned authority, on this the _____ day of _____ , A.D. 20 _____ .

_____
Notary Public in and for
Hidalgo County, Texas.