21

United States District Court
Southern District of Texas
FILED

Sep 09 2003

Michael N. Milby
Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| CARLOS TREVINO, *et al.*, | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. B-02-165 |
| | § | |
| STATE OF TEXAS, *et al.*, | § | |
| Defendants. | § | JURY |

### Defendants' Motion for Summary Judgment

Defendants Raul Garza and the Texas Department of Public Safety file this motion for summary judgment, asking the Court to dismiss the claims against Trooper Garza based upon his entitlement to qualified immunity and to dismiss the claims against DPS based upon its entitlement to sovereign immunity.

### Statement of the Case

Plaintiffs filed suit against the Texas Department of Public Safety for the alleged violation of their Constitutional rights and under State tort law pursuant to the Texas Tort Claims Act. Plaintiffs also bring suit against Trooper Garza for the alleged violation of their Fourth Amendment Constitutional right to be free from false arrest and excessive force. The incident made the basis of Plaintiffs' complaint occurred during a roadside traffic stop on July 22, 2001.

### Exhibits

Exhibit A:    Videotape of incident

Exhibit B:    Dispatch audiotape

Exhibit C:    Affidavit of Trooper Raul Garza

Exhibit D:    Affidavit of Trooper Lionel Trevino

Exhibit E:    Affidavit of Trooper Donny Lopez

Exhibit F:      Affidavit of Mario D. Guerra, Willacy County Constable

## Statement of Facts

On July 22, 2001, at approximately 4:30 p.m., Trooper Garza was working routine patrol on U.S. 77 in Kenedy County, Texas, north of Raymondville. Trooper Garza was asked by DPS Harlingen Communications operator Linda Archer to assist United States Border Patrol agents who were trying to stop a vehicle that was eluding them at a high rate of speed. The vehicle was east bound on Texas Hwy 186 from Starr County. No information was provided pertaining to the vehicle's license plate or the reason why it might be eluding the Border Patrol.

Trooper Garza proceeded south on U.S. 77 from Kenedy County to Business 77 and Texas Hwy 1761 where he parked and monitored his DPS radio to determine which direction the suspect vehicle would go once it reached the intersection of Texas Hwy 186 and Texas Hwy 1761. The vehicle was being tracked by Border Patrol aircraft. Trooper Garza attempted to make radio contact with the aircraft, but it never acknowledged. However, Trooper Garza was able to monitor the aircraft and it informed Border Patrol ground units that the vehicle had turned south on FM 1834 from Texas Hwy 186. The suspect then turned east on FM 490 and proceeded towards U.S. 77. Trooper Garza drove to U.S. 77 where he turned south in order to intercept the vehicle. DPS Harlingen communications advised Trooper Garza that Trooper Leonel Trevino was traveling north on U.S. 77 from Harlingen to assist.

At the time of the incident in question, Trooper Garza had been a peace officer for nine years and based upon his experience, some pursuits originating in Starr County are drug related. Due to the distance  and length of the pursuit of the suspect vehicle, the origin of the pursuit, and the fact

2

that Border Patrol aircraft was used to report the vehicle's location, Trooper Garza thought that

Border Patrol was pursuing a drug courier.

The vehicle was described to Trooper Garza as a green Chevrolet pickup with the tailgate

down. The vehicle was said to be traveling south on U.S. 77 and had just passed the floodway bridge

north of Orphanage Road in Cameron County. Trooper Garza was also traveling south on U.S. 77

with his siren and overhead lights on. Trooper Garza drove up on a green pickup truck with its

tailgate down. Trooper Garza also observed a county police unit with its emergency lights on in the

shoulder by the pickup. Trooper Garza observed the green pickup slow down to approximately 40

m.p.h. At that time, Trooper Garza saw Trooper Trevino deploy the spike system in front of the

green pickup truck. Trooper Garza had approximately 10 seconds from his initial visual contact of

the green pickup to seeing Trooper Trevino deploy the spike system. Trooper Garza did not have

time to confirm the identity of the vehicle. However, based upon the description provided to Trooper

Garza, the slowing down and maneuvering of the vehicle prior to running over the spike system, and

the observation of Trooper Trevino deploying the spike system, Trooper Garza thought that the green

pickup was the vehicle in question. The pickup truck stopped prior to running over the spike system.

Trooper Garza drove up along the left side of the vehicle to prevent it from driving around

the spike system. Trooper Garza exited his vehicle and gave four verbal commands to the driver to

exit the vehicle. The driver did not respond, move or exit the vehicle. Due to the window tint and

glare, Trooper Garza was unable to observe the number of occupants in the vehicle. Trooper Garza

feared for his and the other officers safety as it was still possible for the vehicle to back up and elude

them as there was nothing blocking it from behind.

3

Trooper Garza approached the driver's side of the vehicle with his weapon drawn and ordered the driver to exit the vehicle and get down on the ground. Trooper Garza drew his weapon due the duration of the pursuit and his inability to determine the number of occupants of the vehicle. Again, the driver did not respond. Trooper Garza opened the driver's side door. Trooper Garza holstered his weapon and pulled the driver out of the truck, and again ordered him to the ground. The driver complied and did not resist. Trooper Garza handcuffed the driver for everyone's safety. Laying the driver on the ground was necessary in order to immobilize the driver and handcuff him in the safest manner.

Troopers Trevino and Lopez got the remainder to the occupants out of the vehicle. After a brief period, the vehicle occupants were lead off the road to the side of the road. Border Patrol arrived within minutes. It was determined that the wrong green pickup truck had been stopped and that the correct vehicle had been stopped a few miles down the road. Once it was determined the vehicle which had been stopped was not the vehicle being pursued, the occupants were released. The occupants are the Plaintiffs.

## Argument

### Claims against the Texas Department of Public Safety

#### Constitutional claims

The Plaintiffs bring a claim pursuant to 42 U.S.C. § 1983 against DPS for the alleged violation of their Constitutional rights. However, "[t]he Eleventh Amendment bars claims brought against a state brought pursuant to 42 U.S.C. § 1983." *Aguilar v. Texas Department of Criminal Justice, Institutional Division*, 160 F.3d 1052, 1054 (5th Cir. 1998); *See Puerto Rico Aqueduct and Sewer Authority v. Metcalf & Eddy, Inc.*, 506 U.S. 139,144, 113 S. Ct. 684, 688-689 (1993)

4

("Absent waiver, neither a State nor agencies acting under its control may be subject to suit in federal court." (internal citations omitted); *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 66, 109 S. Ct. 2304, 2309 (1989) ("[C]ongress, in passing § 1983, had no intention to disturb the States' Eleventh Amendment immunity."); *Champagne v. Jefferson Parish Sheriff's Office*, 188 F.3d 312, 313 & 314 (5th Cir. 1999) ("The Eleventh Amendment bars citizens' suits in federal court against States and their alter egos.") ("Section 1983 does not abrogate Eleventh Amendment immunity."); *Aguilar v. Texas Department of Criminal Justice, Institutional Division*, 160 F.3d 1052, 1054 (5th Cir. 1998) ("The Eleventh Amendment bars claims brought against a state brought pursuant to 42 U.S.C. § 1983.") ("Section 1983 does not waive the states' sovereign immunity.")

This result does not change even if the state or state agency consents to the removal of a suit from state to federal court. *Lapides v. Board of Regents of the University System of Georgia*, 122 S. Ct. 1640, 1643 (2002). The result does not change even if the plaintiff's complaint is brought in state court. *Petta v. Rivera*, 44 S.W.3d 575, 581 (Tex. 2001). The Plaintiffs Constitutional claims against DPS must be dismissed.

### Texas Tort Claims Act

Plaintiffs also bring a claim against DPS pursuant to the Texas Tort Claims Act ("Act") for the negligent use of a motor vehicle, personal property, and real property. Sovereign immunity is an affirmative defense of a state and its agencies against state law claims. *Federal Sign v. Texas Southern University*, 951 S.W.2d 401 (1997). The Act is a limited waiver of that sovereign immunity by the State or its agencies. *Texas Department of Transportation v. Able*, 35 S.W.3d 608, 611 (Tex. 2000). The limited waiver of sovereign immunity is set out in §101.021 of the Texas Civil Practice and Remedies Code, which provides:

5

"A governmental unit in the state is liable for:

(1) property damage, personal injury, and death proximately caused by the wrongful act or omission or the negligence of an employee acting within his scope of employment if:

    (A) the property damage, personal injury, or death arises from the operation or use of a motor-driven vehicle or motor-driven equipment; and

    (B) the employee would be personally liable to the claimant according to Texas law; and

(2) personal injury and death so caused by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law."

Tex.Civ.Prac. & Rem. Code § 101.021.

The elements of actionable negligence are: (1) existence of duty on the part of one party to another; (2) breach of that duty; and (3) injury proximately caused by the breach of that duty. *C.J. Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex. 1995).

The actions taken by Trooper Garza were intentional. Assuming that the Plaintiffs bring state tort claims for the intentional torts of false arrest, assault and/or intentional infliction of emotional distress, intentional torts are exempted from the Act. Tex.Civ.Prac. & Rem. Code §101.057(2); *McCord v. Memorial Medical Center Hospital*, 750 S.W.2d 362, 363 (Tex.App. – Corpus Christi 1988, no writ). Trooper Garza's use of the information given to him regarding the truck which was being pursued does not waive DPS' sovereign immunity as "[u]se, misuse, or nonuse of information does not constitute use, misuse, or nonuse of tangible personal property under section 101.021(2)." *Prairie View A&M University v. Mitchell*, 27 F.3d 323, 326 (Tex.App. – Houston[1st Dist.] 2000,

6

review denied). Plaintiffs allege negligent training and supervision. However, sovereign immunity is not waived for negligent training or supervision. *Naranjo v. Southwest Independent School District*, 777 S.W.2d 190, 192 (Tex.App. – San Antonio 1989, writ denied).

Personal property was merely used by Trooper Garza and the other troopers and did not in any way contribute to any alleged injuries suffered by the Plaintiffs. Therefore, sovereign immunity has not been waived. "We do not believe the legislature intended that immunity be waived where tangible property was merely used, but did not contribute to or cause the alleged injury." *Smith v. Tarrant County*, 946 S.W.2d 496, 501 (Tex.App. – Fort Worth 1997, writ denied). Moreover, there is no indication that real property was used in any way nor contributed to any alleged injury to the Plaintiffs. Lastly, there is no indication that the negligent operation of a motor-driven vehicle in any way caused injury to the Plaintiffs. The Texas Department of Public Safety has not waived its entitlement to sovereign immunity and therefore the claims against it must be dismissed.

### Claims against Trooper Garza

#### Qualified immunity

It appears that the Plaintiffs allege that Trooper Gaza violated their Fourth Amendment rights through false arrest and the use of excessive force. However, Trooper Garza is entitled to qualified immunity from both. Qualified immunity is an affirmative defense to all federal law claims. *Harlow v. Fitzgerald*, 457 U.S. 800, 815, 102 S. Ct. 2727, 2736 (1982). Peace officers are entitled to the affirmative defense of qualified immunity. *Gagne v. City of Galveston*, 805 F.2d 558, 559 (5th Cir. 1986). Under the doctrine of qualified immunity, government officials are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional

rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982).

Qualified immunity is a threshold legal question to be decided by the court. *Mitchell v. Forsyth*, 472 U.S. 511, 527-529, 105 S. Ct. 2806, 2815-2817 (1985). The government official's liability generally turns on the objective legal reasonableness of the action assessed in the light of the legal rules that were clearly established at the time it was taken. *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S. Ct. 3034, 3038 (1987). The reasonableness of the defendant's action is measured against the law as it existed at the time of the conduct in question. *Valencia v. Wiggins*, 981 F.2d 1440, 1448 (5th Cir. 1993) *cert. denied*, 113 S. Ct. 2998 (1993). Qualified immunity "gives ample room for mistaken judgments" by protecting "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 343, 106 S. Ct. 1092, 1097 (1986). Conduct which is merely negligent cannot meet the standard for liability under section 1983. *Daniels v. Williams*, 474 U.S. 326, 331-334, 106 S. Ct. 662, 664-667 (1986); *Davidson v. Cannon*, 474 U.S. 344, 347, 106 S. Ct. 668, 670 (1986). Trooper Garza is entitled to qualified immunity, as demonstrated below.

**False Arrest**

False arrest claims are analyzed under the Fourth Amendment. *Blackwell v. Barton*, 34 F.3d 298, 302 (5th Cir. 1994). "Claims for false arrest focus on the validity of the arrest, not on the validity of each individual charge made during the course of the arrest." *Price v. Roark*, 256 F.3d 364, 369 (5th Cir. 2001) (citing *Wells v. Bonner*, 45 F.3d 90, 95 (5th Cir. 1995)).

To ascertain whether an officer is entitled to qualified immunity in a false arrest claim, the Court must determine whether a reasonable officer could have thought he had probable cause to arrest someone he believed had, or will commit an offense, in light of the circumstances he faces and

8

the law which was clearly established. *Gibson v. Rich*, 44 F.3d 274 (5th Cir. 1995); *Babb v. Dorman*, 33 F.3d 472, 477 (5th Cir. 1994). "[T]here must not even arguably be probable cause for the search and arrest for immunity to be lost." *Hart v. O'Brien*, 127 F.3d 424, 444 (5th Cir. 1997). "If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Atwater v. City of Lago Vista*, 532 U.S. 318, 354, 121 S. Ct. 1536, 1557 (2001). "Thus, we have found that 'if there was probable cause for any of the charges made... then the arrest was supported by probable cause, and the claim for false arrest fails." *Price*, 256 F.3d at 369 (citing *Wells v. Bonner*, 45 F.3d 90, 95 (5th Cir. 1995)).

An officer is immune from suit even if it is later determined that probable cause did not exist. *Babb*, 33 F.3d at 477. If reasonable officers could disagree whether probable cause existed, immunity is recognized. *Babb*, 33 F.3d at 477. The false arrest standard provides ample room for mistaken judgment, protecting all but those who knowingly violate the law or who are plainly incompetent. *Mangieri v. Clifton*, 29 F.3d 1012, 1017 (5th Cir. 1994). The Fourth amendment does not guarantee that only the guilty will be arrested. Indeed, if it were otherwise, every acquitted defendant, every suspect released, would have a false arrest claim under §1983. *Mangieri*, 29 F.3d at 1017.

The description of the vehicle given to Trooper Garza was a green pickup with its tailgate down. No further descriptive information was provided. The Plaintiffs' vehicle fit this description, as seen on the video. It would be objectively reasonable that Trooper Garza believed the Plaintiffs' pickup truck was the vehicle which had been eluding Border Patrol. Qualified immunity provides

9

for mistakes. Negligence does not give rise to a Constitutional claim. The Plaintiffs' claim for false

arrest must be dismissed as Trooper Garza is entitled to qualified immunity.

### Excessive Force

In order to demonstrate the use of excessive force, the plaintiff must prove some injury,

which resulted directly and only from the use of force that was clearly excessive to the need, and that

the force used was objectively unreasonable. *Williams v. Bramer*, 180 F.3d 699, 703 (5th Cir. 1999).

Additionally, plaintiff is required to have suffered at least a *de minimis* injury." *Williams*, 180 F.3d

at 703. Whether an injury is *de minimis* is determined by the context is which it arose. *Williams*, 180

F.3d at 703-704.

First, Plaintiffs contend that Trooper Garza verbally abused them. However, "[m]ere

allegations of verbal abuse do not present actionable claims under §1983." *Bender v. Brumley*, 994

F.2d 1151, 1155 n.4 (5th Cir. 1993). Plaintiff Carlos Trevino was handcuffed during the incident in

question. However, "handcuffing too tightly, without more, does not amount to excessive force."

*Glenn v. City of Tyler*, 242 F.2d 307, 314 (5th Cir. 2001). Plaintiffs complain that Trooper Garza

pointed his gun at them. However, pointing a gun at unknown individuals during a potential arrest

does not constitute excessive force. *Mouille v. City of Live Oak, Texas*, 977 F.2d 924 (5th Cir. 1992).

Plaintiffs Sylvia Pinales, Alejandro Trevino, Claudia Pinales and Elsa Guerrero were never

touched by Trooper Garza and they cannot demonstrate any injuries directly from any use of force

by Trooper Garza. Furthermore, any injuries due to lying down near the hot pavement would *de*

*minimis*. Discomfort during an arrest does not constitute the use of excessive force. *Glenn*, 242 F.

2d at 314.

The only force used by Trooper Garza against Plaintiff Carlos Trevino was in pulling him out of the vehicle and placing him on the ground. This type of use of force is not unconstitutional. It was necessary given the lack of response by Plaintiff Carlos Trevino in exiting the vehicle. Trooper Garza thought the pursuit might involve a drug courier, which could certainly indicate the presence of weapons. Placing Plaintiff Carlos Trevino on the ground was the best way to immobilize him and place handcuffs on him. The actions of Trooper Garza were objectively reasonable.

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

BARRY R. McBEE
First Assistant Attorney General

JAY KIMBROUGH
Deputy Attorney General for Criminal Justice

JOHN A. NEAL
Assistant Attorney General
Chief, Criminal Law Enforcement Division

PHILLIP E. MARRUS
Assistant Attorney General
Section Chief, Litigation Services

SETH BYRON DENNIS
Assistant Attorney General
Litigation Services Section
State Bar No. 00790580
P. O. Box 12548, Capitol Station
Austin, Texas 78711
(512) 463-2080
Fax No. (512) 495-9139

**Attorneys for Defendants**

11

## Certificate of Service

I, Seth Byron Dennis, Assistant Attorney General of Texas, do hereby certify that a true and correct copy of the above and foregoing **Defendants' Motion for Summary Judgment** has been served by placing same in the United States mail on this the 3rd day of September, 2003, addressed to:

Reynaldo Garza, III
Law Office of Ernesto Gamez, Jr., P.C.
777 E Harrison Street
Brownsville, Texas 78520

_____

SETH BYRON DENNIS
Assistant Attorney General

12

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| **CARLOS TREVINO,** *et al.,* | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. B-02-165 |
| | § | |
| **STATE OF TEXAS,** *et al.,* | § | |
| *Defendants.* | § | **JURY** |

**Defendants' Motion for Summary Judgment**

# EXHIBIT A

Video in separate folder

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| **CARLOS TREVINO**, *et al.*,<br>    *Plaintiffs*, | § § § § | |
| v. | § § | CIVIL ACTION NO. B-02-165 |
| **STATE OF TEXAS**, *et al.*,<br>    *Defendants*. | § § § | **JURY** |

**Defendants' Motion for Summary Judgment**

# EXHIBIT B

Video IN Separate FoLDeR

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| **CARLOS TREVINO,** *et al.,* | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. B-02-165 |
| | § | |
| **STATE OF TEXAS,** *et al.,* | § | |
| *Defendants.* | § | **JURY** |

**Defendants' Motion for Summary Judgment**

# EXHIBIT C

DEPARTMENT OF PUBLIC SAFETY – State of Texas
AFFIDAVIT

THE STATE OF TEXAS
COUNTY OF    Hidalgo

Before me, the undersigned authority in and for said County and State, on this the 15th day of August, 2001
Personally appeared,    **Raul Garza**_____ who, after being by me
duly sworn, deposes and says:

My name is    **Raul Garza**_____ . I am of sound mind, over
18 years of age, and competent to give this affidavit.

ON JULY 22, 2001, AT APPROXIMATELY 4:30 PM I WAS WORKING ROUTINE PATROL AS A SINGLE
MAN UNIT ON US 77 IN KENEDY COUNTY NORTH OF RAYMONDVILLE TX. I WAS ADVISED BY DPS
HARLINGEN COMMUNICATIONS OPERATOR, LINDA ARCHER #4632, TO ASSIST UNITED STATES
BORDER PATROL AGENTS WHO WERE TRYING TO CATCH UP TO A VEHICLE THAT WAS ELUDING
THEM AT HIGH RATE OF SPEED.  THE SUSPECT VEHICLE WAS ELUDING THEM EAST BOUND ON TX
186 FROM STARR COUNTY.  THERE WAS NO INFORMATION IN REGARDS TO THE VEHICLE'S
LICENSE PLATES OR AS TO THE REASONS WHY IT MIGHT BE ELUDING.  AT THIS TIME, I
PROCEEDED SOUTH BOUND ON U.S. 77 FROM KENEDY COUNTY IN RESPONSE TO THE
ASSISTANCE CALL, TO BUSINESS 77 AND TEXAS 1761 WHERE I PARKED AND MONITORED MY DPS
RADIO TO SEE WHICH DIRECTION THE SUSPECT VEHICLE WOULD TAKE AS IT REACHED THE
INTERSECTION OF TX 186 AND TX 1761.  THE SUSPECT VEHICLE WAS BEING TRACKED BY A
BORDER PATROL FIXED WING AIRCRAFT UNIT.  HARLINGEN DPS COMMUNICATIONS ADVISED ME
THAT THE AIRCRAFT UNIT WAS RELAYING TRAFFIC ON INTER CITY (CHANNEL 3).  I ATTEMPTED TO
MAKE RADIO CONTACT WITH THE BORDER PATROL AIRCRAFT BUT WAS NEVER ACKNOWLEDGED. I
CONTINUED MONITORING THE AIRCRAFT UNIT WHICH INFORMED BORDER PATROL GROUND UNITS
THAT THE SUSPECT HAD TURNED SOUTH ON FM 1834 FROM TX 186.  BASED ON RADIO
TRANSMISSIONS, IT WAS EVIDENT THAT US BORDER PATROL GROUND UNITS WERE ACTIVELY
RESPONDING TO THE LOCATIONS GIVEN IN ORDER TO OVERTAKE THE VEHICLE.  THE SUSPECT
VEHICLE THEN TURNED EAST ON FM 490 AND PROCEEDED TOWARDS US 77.  I THEN PROCEEDED
TO US 77 FROM BUSINESS 77 AND TX 1761 WHERE I WENT SOUTH IN ORDER TO INTERCEPT THE
SUSPECT VEHICLE.

DPS HARLINGEN ADVISED ME THAT HARLINGEN TROOPER LEONEL TREVINO #9176 WAS
TRAVELLING NORTH ON US 77 FROM HARLINGEN TX TO ASSIST.  ONCE I KNEW TROOPER TREVINO
WAS NORTHBOUND, I WAS SURE WE WOULD INTERCEPT THE VEHICLE.  I HAVE BEEN A POLICE
OFFICER FOR NINE YEARS AND IN MY EXPERIENCE SOME PURSUITS INITIATED OUT OF STARR
COUNTY ARE DRUG RELATED.  MY EXPERIENCE HAS ALSO SHOWN THAT DRIVERS ELUDE LAW
ENFORCEMENT AGENTS FOR VARIOUS REASONS RANGING FROM MISDEMEANORS TO FELONIES.
DUE TO THE DISTANCE COVERED AND DURATION OF THE "PURSUIT", I DEDUCTED THAT BORDER
PATROL WAS POSSIBLY PURSUING A DRUG COURIER, SINCE THE USE OF THE AIRCRAFT WAS
DEEMED ESSENTIAL BY THE AGENTS TO KEEP CONSTANT CONTACT WITH THE VEHICLE AND
REPORTING ITS LOCATION TO RESPONDING GROUND UNITS.  THE VEHICLE BEING TRACKED BY
UNITED STATED BORDER PATROL AIRCRAFT UNIT WAS DESCRIBED AS A GREEN CHEVROLET
PICKUP WITH THE TAILGATE DOWN. THE VEHICLE WAS SAID TO BE TRAVELLING SOUTH ON US 77
AND HAD JUST PASSED THE FLOODWAY BRIDGE NORTH OF ORPHANAGE RD IN CAMERON
COUNTY.  AS I WAS RESPONDING SOUTHBOUND IN THE INSIDE LANE WITH OVERHEADS, LIGHTS
AND SIREN I INADVERTENTLY DROVE UPON A GREEN PICK-UP WITH THE TAILGATE DOWN,
TRAVELING IN THE OUTSIDE LANE.  UPON SEEING THIS VEHICLE, I ALSO SAW A COUNTY UNIT
WITH ITS EMERGENCY LIGHTS ON IN THE SHOULDER.  AT THAT TIME, I ALSO SAW THE GREEN
VEHICLE SLOW DOWN TO ABOUT 40 MPH AND THEN THAT'S WHEN I SAW TROOPER

TREVINO THROWING THE SPIKE SYSTEM IN FRONT OF THE GREEN TRUCK. THERE WAS A TIME LAPSE OF TEN SECONDS FROM MY INITIAL VISUAL CONTACT WITH THE VEHICLE AND TROOPER TREVINO DEPLOYING THE SPIKE SYSTEM.

AS I HAD INADVERTENTLY DRIVEN UPON THE VEHICLE, APPROXIMATELY 10 SECONDS PRIOR TO TROOPER TREVINO DEPLOYING THE SPIKE SYSTEM, I DID NOT HAVE TIME TO CONFIRM THE IDENTITY OF THE VEHICLE, GIVE LOCATION PRIOR TO RESPONDING TO TROOPER TREVINO'S SPIKE SYSTEM DEPLOYMENT AND MR. TREVINO'S STOPPING PRIOR TO TRAVELLING OVER THE SPIKE SYSTEM. HOWEVER, UPON SEEING TROOPER TREVINO DEPLOYING THE SPIKE SYSTEM AND SEEING THAT THE VEHICLE WHICH CLOSELY MATCHED THE DESCRIPTION GIVEN, BEGAN TO SLOW DOWN AND STOP PRIOR TO TRAVELLING OVER THE SPIKE SYSTEM, IT REINFORCED MY BELIEF THAT THIS WAS THE VEHICLE IN QUESTION. THIS VEHICLE WAS A GREEN FORD F-150 SUPER CAB PICK-UP WITH THE TAILGATE DOWN. THE VEHICLE STOPPED IN RESPONSE TO THE SPIKE SYSTEM'S DEPLOYMENT BY TROOPER TREVINO. BASED ON THE LENGTH AND DURATION OF THE "PURSUIT" I FELT THAT TROOPER TREVINO, IN DEPLOYING THE SPIKE SYSTEM WAS TAKING AN ACTIVE ROLE IN USING A FORCIBLE STOP TECHNIQUE IN ORDER TO BRING THE "PURSUIT" TO A SAFE AND EXPEDIENT END. THE VEHICLE STOPPED IN THE OUTSIDE LANE, PRIOR TO RUNNING OVER THE SPIKE SYSTEM WHICH LED ME TO BELIEVE THAT THIS WAS AN EVASIVE MANEUVER BY THE DRIVER TO AVOID THE SPIKE SYSTEM, AS IS THE CASE IN SOME PURSUITS. AT THIS TIME I DROVE UP ALONG THE LEFT SIDE OF THE VEHICLE TO PREVENT IT FROM POSSIBLY DRIVING AROUND THE SPIKE SYSTEM. I KEPT A CLOSE EYE ON THE VEHICLE TO MAKE SURE IT DID NOT TRY TO RAM MY UNIT IN, ORDER TO GET AROUND THE SPIKE SYSTEM. I GAVE FOUR VERBAL COMMANDS TO THE DRIVER TO EXIT THE VEHICLE. THE VERBAL COMMANDS GIVEN WERE "GET DOWN ON THE GROUND." AT NO TIME DID I USE THE OBSCENE LANGUAGE AS ALLEGED BY MR. TREVINO AND HIS FAMILY. I YELLED SO THE DRIVER COULD HEAR ME OVER MY SIREN, WHICH I LEFT ON. THE DRIVER DID NOT RESPOND AND DID NOT MOVE. THE DRIVER NEVER EXITED THE VEHICLE NOR DID HE OPEN HIS DOOR OR, ROLL DOWN HIS WINDOW TO SEE WHAT WE NEEDED. I COULD NOT SEE HOW MANY OCCUPANTS WERE IN THE VEHICLE DUE TO THE TINT AND GLARE. NOT KNOWING HOW MANY PEOPLE WERE IN THE VEHICLE OR WHY THE VEHICLE HAD BEEN ELUDING, I FEARED FOR MY SAFETY AND THOSE AROUND THAT THE VEHICLE MIGHT BACK OUT OF THE "BOX" HE WAS IN SINCE NO PATROL CAR WAS COVERING THE REAR TO PREVENT ESCAPE. I APPROACHED THE DRIVER'S SIDE OF THE VEHICLE WITH MY WEAPON DRAWN AND GAVE VERBAL COMMANDS FOR THE DRIVER TO GET DOWN AND LAY ON THE GROUND. THE DRIVER WAS SMILING AND DID NOT SEEM TO TAKE THE SITUATION SERIOUSLY AS I OPENED THE DOOR. I HOLSTERED MY DUTY WEAPON AND ESCORTED THE DRIVER OUT OF THE VEHICLE BY PLACING ONE OF MY HANDS ON HIS LEFT ARM AND PLACING MY OTHER HAND ON HIS BACK NEAR HIS LEFT SHOULDER AND GUIDED HIM OUT OF THE TRUCK AND TOLD HIM TO GET DOWN. THE DRIVER COMPLIED AND LAID ON THE ROADWAY AS ORDERED. THE DRIVER DID NOT RESIST AND WAS QUICKLY HANDCUFFED FOR MY SAFETY, HIS SAFETY AND THOSE AROUND WITHOUT ANY PROBLEMS. THE REASON I HAD THE DRIVER LAY ON THE PAVEMENT WAS TO IMMOBILIZE AND HANDCUFF HIM IN THE SAFEST MANNER. AS I CONDUCTED THESE ACTIONS, TROOPER TREVINO HAD THE OTHER PASSENGERS, 1 YOUNG TEENAGE MALE, ONE YOUNG TEENAGE FEMALE AND 2 OLDER FEMALES, EXIT THE VEHICLE. DURING THESE ACTIONS NO ABUSIVE LANGUAGE OR VERBAL THREATS WERE MADE TOWARD THE DRIVER. IN ADDITION, I DID NOT HEAR ANY OTHER PERSONS USE ABUSIVE LANGUAGE TOWARDS THE OTHER PARTIES INVOLVED. AFTER REVIEWING MY UNIT VIDEO, IT WAS BROUGHT TO MY ATTENTION THAT THE WORD "ASS" WAS UTTERED BY ME. I AM NOT SURE IN WHAT CONTEXT THIS WORD WAS USED. I CANNOT REMEMBER USING THIS WORD, BUT I AM SURE THAT IS MY VOICE IN THE VIDEO. THE DRIVER WAS HANDCUFFED WITH HIS HANDS TO THE BACK. IMMEDIATELY AFTER HANDCUFFING MR. TREVINO, I TOLD THE DEPUTY IN PLAIN CLOTHING TO HOLD HIM THERE. I PROCEEDED TO MOVE MY UNIT OFF THE ROADWAY AND ASKED TROOPER TREVINO TO HAVE THE OTHER PEOPLE MOVE OFF THE ROADWAY AS WELL IN ORDER TO OPEN UP THE ROAD. THIS WAS DONE AFTER 1 MINUTE AND 21 SECONDS. ALL SUBJECTS WERE DIRECTED TO THE SIDE OF THE ROAD. THE US BORDER PATROL AGENTS ARRIVED APPROXIMATELY 2 ½ MINUTES LATER.

Affidavit of   **Raul Garza**
Page   **3**         of   **4**

I MADE CONTACT WITH BORDER PATROL AGENTS D. BEACH, STAR # 2114 AND RUBEN RAMIREZ STAR # 2072, FROM THE FALFURRIAS SECTOR. AGENT R. RAMIREZ ASKED FOR THE LOCATION OF TROOPER RAMOS. I INFORMED AGENT RAMIREZ THAT NONE OF THESE TROOPERS WERE RAMOS. CONTACT WAS THEN MADE WITH HARLINGEN DPS COMMUNICATIONS WHO INFORMED ME THAT TROOPER RAMOS WAS OUT WITH A GREEN PICK-UP WITH THE TAILGATE DOWN APPROXIMATELY A MILE SOUTH OF OUR LOCATION. I WAS NEVER INFORMED BY DPS HARLINGEN, MCALLEN OR U.S. BORDER PATROL THAT TROOPER RAMOS FROM DPS FALFURRIAS, WAS INVOLVED IN THIS PURSUIT. AGENT R. RAMIREZ INFORMED US THAT WE HAD STOPPED THE WRONG VEHICLE. AT THIS TIME, I ESCORTED THE MALE DRIVER, SUBSEQUENTLY IDENTIFIED AS CARLOS TREVINO TO AGENTS D. BEACH AND R. RAMIREZ. AGENT R. RAMIREZ INFORMED MR.TREVINO OF THE ERROR AND MR. TREVINO WAS THEN RELEASED. THE TREVINO FAMILY HAD BEEN DETAINED FOR APPROXIMATELY 6 MINUTES AND RELEASED UPON CONFIRMATION THAT THIS WAS NOT THE VEHICLE IN QUESTION. MR.TREVINO DID NOT COMPLAIN OF ANY INJURIES NOR DID THE OCCUPANTS. MR. TREVINO DID STATE THAT "THIS WOULD NOT STAY LIKE THIS". I THEN ASSISTED THE OTHER TWO LADIES THAT WHERE SITTING ON THE GRASS. ONE OF THE LADIES WAS HAVING A HARD TIME GETTING UP. I ASSISTED HER BY TAKING ONE OF HER ARMS AND HELPING HER UP. BOTH OF THESE LADIES WERE VERY UPSET AS I WALKED THEM BACK TO THEIR VEHICLE. AS WE WALKED BACK TO THE VEHICLE, I DID NOT MAKE ANY CONVERSATION WITH THESE LADIES BECAUSE I COULD TELL THEY WERE VERY UPSET AND I DID NOT WANT TO AGGRAVATE THEM.

I WENT TO THE SECOND LOCATION, U.S. 77 SOUTHBOUND, CAMERON COUNTY TO ASSIST TROOPER RAMOS.  UPON MY ARRIVAL, I MADE CONTACT WITH TROOPER RAMOS WHO STATED THAT THIS WAS THE CORRECT VEHICLE THAT WAS BEING PURSUED BY BORDER PATROL. I ASKED TROOPER RAMOS IF THE DRIVER HAD STATED A REASON FOR HIS FLEEING FROM BORDER PATROL AGENTS. MR. PONCE STATED THAT HE NEVER SAW ANY BORDER PATROL AGENTS TRYING TO STOP HIM. AT THIS TIME I INTRODUCED MYSELF TO MR. PONCE AND ASKED HIM A FEW QUESTIONS. MR. PONCE STATED HE WAS COMING FROM LAREDO TEXAS FROM A WEEKEND TRIP. I ASKED MR. PONCE IF HAD ANY LUGGAGE MR. PONCE STATED ONE BAG WAS HIS AND THE OTHER TWO WERE THE PASSENGERS. MR. PONCE FURTHER STATED THAT THIS WAS A RENTAL VEHICLE. I ASKED MR. PONCE IF THERE WAS A REASON WHY HE DID NOT USE U.S. 83 WHICH IS BIGGER AND BETTER ROADS FOR TRAVEL. MR PONCE DID NOT PROVIDE AN ANSWER. BASED ON ALL THE INFORMATION I HAD I OBTAINED; FOR EXAMPLE ELUDING BORDER PATROL, OVER NIGHT BAGS, MULTIPLE OCCUPANTS, USING BACK ROADS FOR TRAVEL AND A RENTED PICK-UP I ASKED MR. PONCE FOR CONSENT TO SEARCH HIS VEHICLE SINCE THESE ARE COMMON CLUES FOR MONEY AND NARCOTICS COURIERS. MR. PONCE STATED YES AND I ADVISED HIM THAT I HAD A NARCOTICS K-9 THAT WOULD BE CONDUCT THE SEARCH. THE VEHICLE SEARCHED WAS A GREEN CHEVROLET C-1500 SUPER CAB PICK-UP BEARING TEXAS LICENSE PLATES 5HN-Z18. THE VEHICLE WAS DRIVEN BY JOHN PONCE 1/6/72 TEXAS DRIVERS LICENSE 00312372. A COMPLETE K-9 SEARCH WAS CONDUCTED ON THIS VEHICLE WITH NO POSITIVE ALERT MADE BY K-9 BOSLEY. AS I COMPLETED MY K-9 SEARCH, I NOTICED THAT MR. TREVINO, THE DRIVER OF THE FIRST VEHICLE ARRIVED AT THE SCENE. I MADE CONTACT WITH MR. TREVINO, WHO REQUESTED MY PERSONAL INFORMATION. I APOLOGIZED AND PROVIDED HIM WITH MY BUSINESS CARD.

I WOULD LIKE TO REITERATE THAT I RESPONDED TO A CALL FOR ASSISTANCE IN REGARDS TO A VEHICLE ELUDING BORDER PATROL. WHEN I CAME UP INADVERTENTLY TO VEHICLE FITTING THE DESCRIPTION I DID NOT HAVE TIME TO CHECK OUT, DEVELOP PROBABLE CAUSE OR CONFIRM IF IT WAS THE CORRECT VEHICLE BECAUSE TROOPER TREVINO WAS TAKING AN ACTIVE ROLE IN DEPLOYING THE SPIKE SYSTEM. I DID NOT INITIATE A TRAFFIC STOP BUT REACTED TO A COMBINED ACTIONS OF TROOPER TREVINOS DEPLOYMENT OF THE SPIKE SYSTEM AND MR. TREVINO STOPPING PRIOR TO RUNNING OVER THE SPIKE SYSTEM. THESE ACTIONS REINFORCED MY BELIEF THAT THIS WAS THE CORRECT VEHICLE. ONCE THE VEHICLE CAME TO A STOP I

3

Affidavit of   **Raul Garza**
Page   **4**   of   **4**

APPROACHED IT WITH MY GUN DRAW GIVING THE DRIVER SEVERAL VERBAL COMMANDS TO EXIT
THE VEHICLE AND LAY ON THE GROUND. I FELT IT WAS NECESSARY TO DRAW MY WEAPON DUE
TO THE DISTANCE COVERED AND THE DURATION OF THE "PURSUIT". MOREOVER I WAS NOT ABLE
TO DETERMINE THE CONTRIBUTING FACTORS TO THIS PURSUIT OR HOW MANY OCCUPANTS
WERE INVOLVED.

ONCE CONTACT WAS MADE WITH THE DRIVER "MR. TREVINO", I HAD HIM LAY ON THE GROUND
BECAUSE THIS IS THE SAFEST POSITION FOR HANDCUFFING A SUSPECT. MR. TREVINO WAS
HANDCUFFED FOR MY SAFETY, HIS SAFETY, AND THOSE AROUND. AFTER MR. TREVINO WAS
SECURED HE AND HIS FAMILY WERE ESCORTED OFF THE ROADWAY AND ONTO THE GRASS AWAY
FROM DANGER. ONE OF MY MAIN CONCERNS AFTER ESCORTING THE FAMILY OFF THE ROADWAY
WAS TO REMOVE MY UNIT AND MR. TREVINO'S TRUCK TO AVOID ANY ACCIDENTS OR PROPERTY
DAMAGE. ONCE I LEARNED THAT THE MR. TREVINO'S VEHICLE WAS NOT THE CORRECT VEHICLE, I
INFORMED MR. TREVINO OF OUR ERROR AND INFORMED HIM THAT BORDER PATROL AGENT R.
RAMIREZ WOULD EXPLAIN WHAT HAPPEN. I WENT TO THE SECOND LOCATION, U.S. 77
SOUTHBOUND, CAMERON COUNTY TO ASSIST TROOPER RAMOS.   UPON MY ARRIVAL, I MADE
CONTACT WITH TROOPER RAMOS WHO STATED THAT THIS WAS THE CORRECT VEHICLE THAT
WAS BEING PURSUED BY BORDER PATROL. I INTRODUCED MYSELF TO THE DRIVER IDENTIFIED AS
JOHN  PONCE AND ASKED HIM A FEW QUESTIONS. MR. PONCE STATED HE WAS COMING FROM
LAREDO TEXAS FROM A WEEKEND TRIP. AFTER INTERVIEWING MR. PONCE I ASKED HIM FOR
VERBAL CONSENT TO SEARCH HIS VEHICLE. I ASKED TO SEARCH THE VEHICLE BASED ON THE
FACTS THAT MR. PONCE WAS ELUDING BORDER PATROL, LIMITED LUGGAGE, MULTIPLE
OCCUPANTS, USING BACK ROADS FOR TRAVEL AND THE USE OF A RENTED PICK-UP. ALL THESE
FACTORS ARE INDICATORS THAT ARE COMMON CLUES FOR MONEY AND NARCOTICS COURIERS.
THE SEARCH OF THE VEHICLE WAS CONDUCTED BY ME WITH THE ASSISTANCE OF MY DPS K-9
"BOSLEY". A COMPLETE K-9 SEARCH WAS CONDUCTED ON THIS VEHICLE WITH NO POSITIVE
ALERT MADE BY K-9 "BOSLEY". AS I COMPLETED MY K-9 SEARCH, I NOTICED THAT MR. TREVINO,
THE DRIVER OF THE FIRST VEHICLE ARRIVED AT THE SCENE. I MADE CONTACT WITH MR.
TREVINO, WHO REQUESTED MY PERSONAL INFORMATION. I APOLOGIZED AND PROVIDED HIM
WITH MY BUSINESS CARD.

THE FIRST TRAFFIC STOP CONDUCTED ON MR. TREVINO WAS RECORDED BY MY UNIT'S MOBILE
VIDEO CAMERA. THE TIMES AND DATES ON THE VIDEO TAPE WERE NOT SET TO THE CORRECT
DATE AND TIME OF THIS EVENT.

I have read the above statement consisting of   **4**   page(s), which is based on my
personal knowledge, and it is true and correct.

Subscribed and sworn to before me, the undersigned authority, on this the   15th   day
of   August   , A.D. 20   01

Notary Public in and for
Hidalgo County, Texas.



B. NELLY VALADEZ
MY COMMISSION EXPIRES
March 16, 2005

4

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| **CARLOS TREVINO,** *et al.,* | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. B-02-165 |
| | § | |
| **STATE OF TEXAS,** *et al.,* | § | |
| *Defendants.* | § | **JURY** |

**Defendants' Motion for Summary Judgment**

# EXHIBIT D

## DEPARTMENT OF PUBLIC SAFETY
### State of Texas

### Voluntary Statement - (Not under arrest)

**THE STATE OF TEXAS:**

**COUNTY OF CAMERON:**

Before me, the undersigned authority in and for the State of Texas, on this day, personally appeared   Lionel Trevino  , who, after being by me duly sworn, deposed and said:

My name is  Lionel Trevino , I am of sound mind, over 18 years of age, and competent to give this affidavit.

 

On 07-22-01, at approximately 4:00 p.m., Troopers Lionel Trevino and Donny Lopez were working at the DPS office in Harlingen, Texas. Troopers Trevino and Lopez were working on paper work when they were notified by a Harlingen DPS communications operator of a vehicle that was eluding a Border Patrol Unit from Rio Grande City. The Harlingen DPS communications operator stated that Border Patrol was requesting assistance from DPS.

Troopers Trevino and Lopez were notified that the vehicle eluding Border Partrol was traveling east towards Raymondville, Texas. Harlingen DPS communications notified Troopers Trevino and Lopez to be on standby for assistance in case the vehicle turned south towards Harlingen.

The Harlingen DPS communications operator notified Troopers Trevino and Lopez that it had been confirmed that the vehicle was headed south from Raymondville to Harlingen. The Harlingen DPS communications operator was notified that the vehicle was described as a green Chevy pickup truck with the tailgate down, and was now traveling south on US 77.

Troopers Trevino and Lopez were told by the Harlingen DPS communications operator that assistance was needed. Troopers Trevino and Lopez immediately got in their black and white patrol car, activated the emergency lights and headed north on US 77.

While Troopers Trevino and Lopez drove north, they were listening to radio traffic which had indicated that the green pickup was traveling south on US 77 and was refusing to stop for marked Border Patrol, DPS and Willacy County Sheriff patrol cars. Troopers Trevino and Lopez were approaching Orphanage Road, just a few miles south from the last radio location where the green pickup truck was spotted.

Troopers Trevino and Lopez crossed the median of US 77 to get on the southbound lane, so that they could set up to deploy the Stinger Spike System. Trooper Trevino parked the patrol car facing south on the right improved shoulder of US 77. Trooper Trevino exited the patrol unit and got the spike system ready. Troopers Trevino and Lopez spotted red and blue lights coming on the floodway just north of our location. Trooper Trevino deployed the spike system and waited as the red and blue lights got

closer. As the lights got closer Troopers Trevino and Lopez noticed that it was a DPS
unit and a Willacy County Sheriff's Unit traveling at a high rate a speed with no vehicles in
front or behind them. Trooper Trevino immediately recovered the spike system from the
roadway, while Trooper Lopez called Willacy County Sheriff's Office communications on
the radio to get a location of the pursuit. Trooper Lopez also advised Willacy County
communications that two patrol units had just driven past our location and there was no
vehicle in front or behind them.

Willacy County communications indicated that the vehicle was approaching the
floodway north of our location. Troopers Trevino and Lopez stood by and waited for the
vehicle. A few minutes later Troopers Trevino and Lopez saw red and blue lights
approaching in the distance north of the floodway. As the lights got closer, Troopers
Trevino and Lopez saw a green pickup truck on the inside lane in front of two patrol units
with their emergency red and blue lights flashing. As the green pickup truck approached
Troopers Trevino and Lopez' location, it appeared that the green pickup was traveling at
about 40 to 50 miles per hour, and was not stopping or moving to the right shoulder.

As the green pickup approached Troopers Trevino and Lopez' location, Trooper
Trevino noticed that the tailgate on the green Ford pickup was down. Trooper Trevino
deployed the spike system across the roadway and waited for the green pickup truck run
them over. As the green pickup truck approached it slowed down and then came to a stop
before going over the spike system.

At this time a black and white DPS unit traveling behind the green pickup truck
stopped at the left passenger door of the truck. The Trooper exited his patrol car and
conducted a Felony Stop with his gun drawn. Troopers Trevino and Lopez drew and
pointed their firearms at the passenger side door of the truck to provide cover for the
Trooper later identified as Raul Garza.

Trooper Trevino approached the passenger side of the vehicle and opened the door.
Trooper Trevino told the passengers to get out of the vehicle. As they exited slowly one
by one, Trooper Trevino advised them to get down on the ground. Troopers Trevino and
Lopez never made any physical contact with the passengers. Trooper Trevino noticed that
the passengers were uncomfortable on the pavement so, Trooper Trevino told the
passengers to get up and move to the grass off of the improved shoulder. It was a hot day
and Trooper Trevino asumed that the passengers where uncomfortable because the
pavement was hot.

Trooper Trevino then proceeded to remove the spike system from the roadway so
that Trooper Garza could move the green pickup truck off of the roadway. Trooper
Lopez watched over the suspects as Border Patrol agents arrived and spoke to Trooper
Garza. After the suspects were turned over to Border Patrol Agents, Troopers Trevino
and Lopez left the scene. Troopers Trevino and Lopez reported back to the Harlingen
DPS office.

I have read the above statement, consisting of two page(s), which is based on
my personal knowledge, and it is true and correct.

Subscribed and sworn to before me, the undersigned authority on this 29th day of  August, A.D. 2001.

Notary Public in and for
Cameron County, Texas

B. NELLY VALADEZ
MY COMMISSION EXPIRES
March 16, 2005

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| **CARLOS TREVINO,** *et al.,* | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. B-02-165 |
| | § | |
| **STATE OF TEXAS,** *et al.,* | § | |
| *Defendants.* | § | **JURY** |

**Defendants' Motion for Summary Judgment**

# EXHIBIT E

## DEPARTMENT OF PUBLIC SAFETY
### State of Texas

### Voluntary Statement - (Not under arrest)

**THE STATE OF TEXAS:**

**COUNTY OF CAMERON:**

Before me, the undersigned authority in and for the State of Texas, on this day, personally appeared ___Donny Lopez___, who, after being by me duly sworn, deposed and said:

My name is ___Donny Lopez___, I am of sound mind, over 18 years of age, and competent to give this affidavit.

     On July 22, 2001, at approximately 4:00 p.m., Troopers Donny Lopez and Leo Trevino were working at the DPS office in Harlingen, Texas. Troopers Lopez and Trevino were working on paper work on this day when they were notified by Harlingen DPS communications of a vehicle that had eluded from Border Patrol in Rio Grande City. Harlingen DPS communications stated that Border Patrol was requesting assistance from DPS.
     Troopers Lopez and Trevino were notified that vehicle eluding from Border Partrol was traveling east towards Raymondville, Texas. Harlingen DPS communications notified Troopers Lopez and Trevino to be on standby for assistance incase the vehilcle would turn south and head towards Harlingen. Troopers Lopez and Trevino stood by and continued with paper work.
     About five minutes later, Harlingen DPS communications notified Troopers Lopez and Trevino that it had been confirmed that the vehicle was headed into the City of Raymondville. Harlingen DPS communications was then notified that the vehicle was described as a green Chevy pickup truck with the tailgate down, and was now traveling south on Business 77. Troopers Lopez and Trevino were told by Harlingen DPS communications to assist. Troopers Lopez and Trevino immediately got in their clearly marked black and white patrol unit and activated the emergency lights and headed north on US 77. While Troopers Lopez and Trevino drove north they were listening to radio traffic which had indicated that the green pickup was traveling south on US 77 and was refusing to stop for marked units. At this time Troopers Lopez and Trevino were approaching Orphanage Road just a few miles south from last location where the green pickup truck was spotted traveling south. Troopers Lopez and Trevino crossed the median on US 77 to get on southbound lane.
     They crossed the median so that they could set up and the get their spike system ready for deployment. Trooper Trevino parked the clearly marked black and white patrol unit facing south on the right side improved shoulder of US 77 southbound lane. Trooper Trevino exited the patrol unit and got the spike system ready. Troopers Lopez and Trevino spotted red and blue lights traveling south on the floodway just north of their location. Trooper Trevino deployed the spike system and waited as the red and blue lights got closer.

As the red and blue lights got closer Troopers Lopez and Trevino noticed that it was one DPS unit and one County Unit and there was no green pickup truck in front or behind them. Trooper Trevino immediately recovered the spike system from the roadway, while Trooper Lopez called Willacy County Sheriffs Office communications and notified them that two patrol units had just gone by but there was no vehicle in front or behind them. Willlacy County communications indicated that the vehicle was approaching the floodway north of their location. Troopers Lopez and Trevino stood by and waited for the vehicle.

A few minutes later Troopers Lopez and Trevino saw red and blue lights approaching in the distance north of the floodway. As the lights got closer Troopers Lopez and Trevino spotted a green pickup truck on the inside lane in front of two patrol units with their emergency red and blue lights flashing. As the green pickup truck approached Troopers Lopez and Trevino's location it appeared that the green pickup was traveling at about 40 to 50 miles per hour, and was not stopping or moving over to the right shoulder as a vehicle should for an emergency vehicle.

As the green pickup got nearer to Trooper Lopez and Trevino's location, Trooper Lopez noticed that the tailgate on the green Ford pickup was down just like the description given earlier. Trooper Trevino deployed the spike system across the roadway and waited for the green pickup truck to approach. As the green pickup truck approached, it slowed down and then came to a stop before going over the spike system. At this time the clearly marked black and white DPS unit behind the green pickup truck drove up on the rear left side of the green pickup truck. The Trooper exited his patrol car and approached the door of the drivers side door. At that time Troopers Lopez and Trevino drew and pointed firearms at the passenger side of the green pickup truck.

Trooper Trevino approached the passenger side door of the vehicle and opened the door and told the passengers to step out the vehicle one at time slowly. They did not exit right away, so Troopers Lopez and Trevino commanded them in a loud tone to exit the vehicle again. As they exited slowly one by one Troopers Lopez and Trevino instructed them to get down on the ground. The passengers got down on their knees next to the green truck. Trooper Lopez and Trevino never made any physical contact with the passengers. Shortly after everyone was out of the vehicle Trooper Raul Garza brought the driver around the rear of the green pickup truck in handcuffs and placed him with the rest of the passengers on the ground. Trooper Lopez and Trevino then asked the driver and passengers to get up and move to the grass on the side of the improved shoulder. Mr. Carlos Trevino claimed that Troopers used obscene language when they were instructing them to get on the ground. To Trooper Lopez' knowledge and recollection ; no vulgar, profane or any type of obscene language was ever used or heard being spoken or directed at anyone by neither Trooper Trevino, Trooper Garza, or Trooper Lopez himself at the scene like Mr. Trevino claims. Trooper Lopez did remember the driver yelling at the passengers in an angry loud tone to shut up in spanish.

Trooper Trevino then proceeded to remove the spike system from the roadway while Trooper Lopez watched over the suspects. Trooper Garza proceeded to move the green pickup truck and the DPS patrol car out of the inside lane off roadway on US 77 southbound. Border Patrol agents arrived and spoke to Trooper Garza. Shortly after suspects were turned over to Border Patrol authorities, Troopers Lopez and Trevino left the scene and headed towards Harlingen and saw another green pickup truck detained by other DPS units and county units a couple of miles down the road on US 77. Trooper Lopez and Trevino reported back to the Harlingen DPS office.

I have read the above statement, consisting of two page(s), which is based on my personal knowledge, and it is true and correct.

Subscribed and sworn to before me, the undersigned authority on this 29th day of August, A.D. 2001.

B. NELLY VALADEZ
MY COMMISSION EXPIRES
March 16, 2005

Notary Public in and for
Cameron County, Texas

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| **CARLOS TREVINO,** *et al.,* | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. B-02-165 |
| | § | |
| **STATE OF TEXAS,** *et al.,* | § | |
| *Defendants.* | § | **JURY** |

**Defendants' Motion for Summary Judgment**

# EXHIBIT F

## DEPARTMENT OF PUBLIC SAFETY – State of Texas
## AFFIDAVIT

**THE STATE OF TEXAS**
**COUNTY OF**     Hidalgo

Before me, the undersigned authority in and for said County and State, on this the 17th  day of  October, 2001
personally appeared,     **Mario D. Guerra**_____  who, after being by me
duly sworn, deposes and says:

My name is     **Mario D. Guerra**_____ .  I am of sound mind, over
18 years of age, and competent to give this affidavit.

My name is Mario D. Guerra, I am 57 years of age and reside in Sebastian, Texas and mailing
address is P.O. Box 227, Sebastian, TX 78594.  I don't have a home telephone number, but
the Willacy County dispatcher number is (956) 689-5576.

I'm a full-time Constable for Willacy County.

On Sunday, 7/22/01, at about 4:30 p.m., I was working and I heard on my patrol car radio that
Border Patrol needed assistance on a pursuit.  I heard that the vehicle was going south on
U.S. 77 and I went to Spur 413 and U.S. 77 and parked on the west side of the southbound
lane.  After about 10 minutes, I saw a D.P.S. Trooper and a Sheriff's Deputy unit drive past
me, going at a high rate of speed with overheads, but no siren.  After a few minutes, I saw a
green truck coming south behind my position.  The green truck passed me and I saw that it
was a double cab and the tailgate was down.  Behind the green truck, I saw Border Patrol units
and a D.P.S. unit a good distance behind.  The D.P.S. unit and Border Patrol units had their
emergency lights on, but no siren.  After they passed, I turned on my overhead lights and
started after them.  We left Willacy County, entered Cameron County and passed the
Floodway Bridge.  Before we got to Orphanage Road, I saw a Trooper putting the Spikes and
then I saw the truck stop before getting to the Spikes.  I saw the Trooper when I was standing
outside my car on the shoulder where I had stopped.  The Trooper had his gun out and I heard
the Trooper tell the man to get out of the truck.  The man did not get out of the truck.  I then
saw the door open and saw the Trooper grab the driver by the arm and the driver wouldn't go
down after the Trooper told him to get down.  I was in the position to hear the Trooper and he
did not use obscene language.  He just told the driver to get down.  I saw when the Trooper
handcuffed the driver, but did not notice anything unusual or forceful.  The driver was not
cooperating, he was talking and yelling why they were doing that.  The driver was telling the
other people not to say anything—that he would do all the talking.  After the Trooper
handcuffed the driver, almost immediately the Trooper asked me to help him pick up the driver
and then I escorted him to one side to keep him away from traffic.  The driver was in socks and
was walking on his own as I escorted him.  I also heard the other two Troopers yelling at the
passengers to get out of the truck, but I did not hear them use obscene language.  He kept
saying that he knew Conrado Cantu and that he was going to talk to his lawyer.  The driver
wanted to know who I was and my name.  After I escorted the man to the side, I told him to
kneel on the pavement.  The passengers were kneeling on the grass facing him and he was
telling them to shut up—that he would do all the talking.  The Border Patrol was there and the
driver was talking to the Border Patrol agents as to what was happening.  While we were there,
no one stated that they were injured and I did not see anybody that might be injured.  When I
left, the passengers were still kneeling by the side on the grass.

Affidavit of   **Mario D. Guerra**

Page   **2**    of   **2**

I have read the above statement consisting of   **2**   page(s), which is based on my personal knowledge, and it is true and correct.

*Mario D. Guerra*

Subscribed and sworn to before me, the undersigned authority, on this the      **17th**    day

of   **October**        , A.D. 20    **01**   .

B. NELLY VALADEZ
MY COMMISSION EXPIRES
March 16, 2005

*B. Nelly Valadez*
*Notary Public in and for*
*Hidalgo County, Texas*

2